**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**
**PHILADELPHIA DIVISION**

| | |
|---|---|
| CITY OF PHILADELPHIA, a municipal corporation, | ) ) ) CIVIL ACTION NO: _____ |
| Plaintiff, | ) ) **COMPLAINT** |
| v. | ) ) **JURY TRIAL DEMANDED** |
| MCKINSEY AND COMPANY, INC., | ) ) |
| Defendant. | ) ) |

# TABLE OF CONTENTS

I.  INTRODUCTION ..........................................................................................................1

II.  PARTIES ....................................................................................................................7

    A.  Plaintiff ..............................................................................................................7

    B.  Defendant ..........................................................................................................7

III.  JURISDICTION AND VENUE .................................................................................8

IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS...........................................9

    A.  Purdue Pleads Guilty to Misbranding OxyContin and Enters Into a
        Corporate Integrity Agreement ..................................................................................9

    B.  Purdue Hires McKinsey to Boost Opioid Sales to Circumvent the and
        Corporate Integrity Agreement ................................................................................10

        1.  The Sacklers Distance Themselves from Purdue...................................... 11

        2.  Purdue Hires McKinsey to Devise and Implement an OxyContin
              Sales Strategy Consistent with the Sacklers' Goals.................................. 13

    C.  What McKinsey Does: "Consulting Is More than Giving Advice".......................15

    D.  Purdue Relied on McKinsey ..................................................................................17

    E.  McKinsey Delivered Granular Growth Opportunities for OxyContin .................20

    F.  Purdue Implemented McKinsey's Strategies.........................................................30

        1.  Project Turbocharge................................................................................... 32

    G.  McKinsey's Efforts Triple OxyContin Sales.........................................................35

    H.  McKinsey Was Aware of the Devasting Effects of Opioids and Continued
        ьProvide Marketing Consulting...............................................................................37

    I.  McKinsey Continued Advising Purdue to Increase the Sale of Opioids
        Despite theNationwide Epidemic...........................................................................42

        1.  Purdue Pleads Guilty Once Again ............................................................. 45

        2.  McKinsey's *Mea Culpa* ............................................................................ 46

J.  McKinsey Took Its Purdue Playbook to Other Major Opioid
    Manufacturers .......................................................................................................47

    1.  McKinsey and Mallinckrodt ..................................................................... 48

    2.  McKinsey and Actavis ............................................................................... 49

    3.  McKinsey and Teva/Cephalon ................................................................... 50

    4.  McKinsey and Endo International/Par Pharmaceutical ............................ 51

    5.  McKinsey and Johnson & Johnson ........................................................... 53

K.  McKinsey Worked for All of the Major Opioid Distributors ...............................53

    1.  McKinsey and McKesson .......................................................................... 53

    2.  McKinsey and AmerisourceBergen Drug Corp. ........................................ 56

    3.  McKinsey and Cardinal Health .................................................................. 57

L.  McKinsey Worked for Major Opioids Retailers ...................................................58

    1.  McKinsey and CVS .................................................................................... 58

    2.  McKinsey and Walmart ............................................................................. 61

M.  McKinsey Worked with Several Investment Funds, Including its Own
    Hedge Fund, with Extensive Investment in the Opioid Industry ..........................62

N.  The Impact of McKinsey's Conduct .....................................................................63

V.  FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE
    RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)
    ACT: THE OPIOID MARKETING ENTERPRISE .........................................................66

A.  The Common Purpose and Scheme of the Opioid Marketing Enterprise ..............66

B.  The Conduct of the Opioid Marketing Enterprise Violated Civil RICO ...............69

C.  Pattern of Racketeering Activity ...........................................................................70

VI.  TOLLING OF STATUTES OF LIMITATIONS ..............................................................74

A.  Equitable Estoppel and Fraudulent Concealment ..................................................75

B.  McKinsey and Purdue Persisted in a Fraudulent Scheme Despite a Guilty
    Plea and Large Fine ...............................................................................................76

VII.   CAUSES OF ACTION ....................................................................................................... 78

VIII.  PRAYER FOR RELIEF ................................................................................................... 97

## I.  INTRODUCTION

1.      This case arises from the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids. This crisis arose from opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use for chronic pain.

2.      McKinsey and Company, Inc. ("McKinsey" or "Defendant") played an integral role in creating and deepening the opioid crisis by working with Purdue and other opioid manufacturers, distributors, and pharmacies to designing strategies to maximize those companies' profits without regard to the significant risks associated with flooding the market with highly addictive prescription drugs.

3.      On May 10, 2007, John Brownlee ("Brownlee"), United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P., relating to the misbranding of OxyContin. Brownlee stated,

> Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.

4.      Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services ("HHS"). For a period of five years, ending in 2012, Purdue was obligated to retain an Independent Monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives vis-à-vis their interactions with health care providers.

5.      In the wake of Purdue's accession to the Corporate Integrity Agreement, Purdue faced newly imposed constraints on its sales and marketing practices. Yet despite the agreement's

constraints on how Purdue could market Oxycontin, Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales so that they could sell the company or make it an attractive acquisition target.  As a result of the 2007 guilty plea, the Sacklers made the strategic decision to distance the family from Purdue, which was regarded as an increasingly dangerous "concentration of risk" for Purdue's owners. Ten days after the guilty plea was announced, David Sackler wrote to his dad, Richard Sackler, and uncle, Jonathan Sackler, describing precisely what that "risk" was: legal liability for selling OxyContin. In response to Jonathan stating that "there is no basis to sue 'the family,'" David replied:



Message

| | |
|---|---|
| From: | David Sackler |
| Sent: | 5/17/2007 11:08:08 PM |
| To: | 'Sackler, Jonathan'      I: Sackler, Dr Richard |
| CC: | Ives, Stephen A. |
| Subject: | RE: Idea |
| Attachments: | image001.jpg |

Well I hope you're right, and under logical circumstances I'd agree with you, but we're living in America.  This is the land of the free and the home of the blameless.  We will be sued.  Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us.

6.     Given concern over this "concentration of risk," the two sides of the Sackler family spent considerable time and energy debating the best way to achieve distance from Purdue, and collectively considered either selling the company or having Purdue borrow money for operating funds so the Sacklers, as owners, could make substantial distributions of money from the company to themselves.   In order to pursue either of these options, the Sacklers needed to maximize opioid sales in the short term so as to make Purdue—by then the subject of substantial public scrutiny— appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender.

7.     The Sacklers and Purdue realized that they would need assistance in achieving these internally contradictory objectives. Because Purdue did not have the in-house capabilities to design

and implement a sales strategy for OxyContin to achieve the Sacklers' objectives, they turned to the global management consulting firm McKinsey, which had already been advising the Sacklers and Purdue for at least three years.

8. McKinsey accepted their request, and by June 2009 McKinsey and Purdue were working together to increase sales of Purdue's opioids. McKinsey suggested a specific sales and marketing strategy based on McKinsey's own independent research and unique methodologies, and Purdue adopted that strategy. McKinsey and Purdue then implemented McKinsey's plan. It was wildly successful: despite the strictures imposed upon Purdue by the Corporate Integrity Agreement, OxyContin sales began to multiply.

9. In 2012, Purdue's Corporate Integrity Agreement ended. With its demise, McKinsey's ongoing relationship with Purdue flourished. In 2013, McKinsey proposed, and Purdue implemented with McKinsey's ongoing assistance, *Project Turbocharge*, a marketing strategy to increase opioids sales by hundreds of millions of dollars annually. Purdue then picked a new name—*Evolve 2 Excellence*—and adopted it as the theme to its 2014 national sales campaign. With McKinsey's assistance, Purdue trained its OxyContin sales representatives to operate pursuant to McKinsey's strategy.

10. Within five years, due in large part to McKinsey's strategies that Purdue spent hundreds of millions of dollars to implement, OxyContin sales tripled.[1]

11. In addition to its work for Purdue, McKinsey has performed work for "several other companies on opioids."[2] McKinsey replicated its "success" at Purdue with several other opioid

---

[1] On February 10, 2018, Purdue announced that it would no longer marketing opioids and disbanded its OxyContin sales force.

[2] *See* Drew Armstrong, *McKinsey No Longer Consulting for Purdue, Ends Opioid Work*, BLOOMBERG (May 23, 2019), https://www.bloomberg.com/news/articles/2019-05-24/ mckinsey-no-longer-working-with-purdue-halts-opioid-consulting. While Plaintiff is aware of

manufacturers, including Endo, Janssen, and Actavis.  As it did with Purdue, McKinsey designated strategies designed to maximize sales of opioid drugs by targeting high prescribers of those drugs. Even after the nature and scope of the opioid crisis began to be known, McKinsey continued to advocate these types of strategies.

12.     McKinsey also aided others within the opioid supply chain, including the "Big 3" distributors McKesson, Cardinal Health, and AmerisourceBergen, as well as pharmacies like CVS Health and Walmart.

13.     As a result of its ubiquitous presence in nearly every aspect of increasing the supply of opioids, McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating the opioid crisis for Purdue.[3] On March 7, 2019, Kevin Sneader ("Sneader"), McKinsey's global managing partner, addressed all McKinsey employees regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated, "[W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little doubt that scrutiny – fair and unfair – will continue. It is the price we pay for being 'in the arena' and working on what matters."[4]

_____

work McKinsey has performed for other opioid manufacturers, this Complaint concerns McKinsey's work with Purdue.

[3] *See* Michael Forsythe and Walt Bogdanich, *McKinsey Advised Purdue Pharma How to 'Turbocharge' Opioid Sales*, Lawsuit Says, NEW YORK TIMES, (Feb. 1, 2019), https://www.nytimes.com/2019/02/01/business/purdue-pharma-mckinsey-oxycontin-opiods.html.

[4] See *"The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, FORTUNE MAGAZINE (Mar. 8, 2019), https://fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader/.

The "arena" reference is to Citizenship in a Republic, a speech delivered by Theodore Roosevelt on April 23, 1910: "It is not the critic who counts; not the man who points out how the strong man stumbles, or where the doers of deeds could have done them better. The credit belongs to the man who is actually in the arena [here, McKinsey; and the arena, opioid sales], whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again

4

14.     Weeks later, McKinsey announced that it is no longer working for any opioid manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our communities. We are no longer advising clients on any opioid-specific business and are continuing to support key stakeholders working to combat the crisis," McKinsey stated.[5]

15.     As reported in the media, in a series of agreements, McKinsey recently settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

16.     Because of McKinsey's misconduct, the City of Philadelphia is experiencing a severe opioid-fueled public health crisis.

17.     The City's public health and safety emergency includes historically high incidences of opioid addiction and opioid use disorder and of opioid-related deaths and non-fatal opioid overdoses. It also includes other adverse health effects of opioid addiction and opioid use disorder including historically high incidences of babies born with opioid withdrawal conditions, and an unprecedented increase in new hepatitis C virus ("HCV") infections caused by opioid injections. The epidemic has also been accompanied by an unprecedented level of opioid-related emergency room visits and hospitalizations; extensive provision of emergency response services by the Fire Department and other City agencies in reviving and transporting overdose victims; and the expenditure of enormous resources by the Police Department, District Attorney's Office, Public Defender's Office, City prison system, Health Department, Department of Behavioral Health and

---

and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat."

[5] *See* Paul La Monica, *Consulting firm McKinsey no longer working with opioid maker Purdue Pharma*, CNN Bus. (May 24, 2019), https://www.cnn.com/2019/05/24/business/mckinsey-purdue-pharma-oxycontin/index.html. The statement was attributed to McKinsey as an entity. No individual's name was attributed.

Intellectual Disability Services, Department of Human Services, and other City departments and agencies providing health and related services to address increased crime and violence and family and social dysfunction linked to opioid use and addiction. The Medical Examiner's office is struggling to keep up with the rising tide of opioid deaths. In 2017, the homicide rate in Philadelphia reached its highest level since 2012, due in part to the opioid epidemic and competition from rival drug dealers who sell opioids.

18.     The opioid epidemic and its deleterious impact on public health and safety in the City has created an overall substantial, repeated, and steadily increasing drain on the City's financial, personnel, medical, and other resources and capacities.

19.     The City has incurred substantial costs in responding to the opioid crisis and will continue to do so in the future.  Due to McKinsey's conduct, the City has endured a financial burden including, *inter alia*: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs for providing welfare for children whose parents suffer from opioid-related disability or incapacitation; (5) costs associated with law enforcement and public safety relating to the opioid epidemic and (6) loss of tax revenue due to the decreased efficiency and size of the working population in the City. Philadelphia has suffered and continues to suffer these damages directly.

## II. PARTIES

### A.    Plaintiff

20.    Plaintiff, City of Philadelphia, is a municipal corporation, duly organized and existing by virtue of the laws of the Commonwealth of Pennsylvania (the "Commonwealth"). Philadelphia is the largest city in the Commonwealth and sixth-largest city in the United States.

21.    The City of Philadelphia includes Philadelphia County, which is merged with the City. They are collectively referred to here as the "City of Philadelphia," "City," "Philadelphia," or "Plaintiff." Philadelphia is home to approximately 1.6 million people.

22.    The City provides a wide range of social services on behalf of Philadelphia residents, including health-related services.  In addition, the City administers and provides funding for the Philadelphia Police Department, Philadelphia Fire Department, the District Attorney's Office, the Defender Association of Philadelphia, the Philadelphia Department of Health, the Philadelphia Department of Behavioral Health and Intellectual disAbility Services, the Philadelphia Department of Human Services, and other public health and safety departments and agencies responsible for the public health, safety, and welfare of its citizens.

23.    Plaintiff has standing to seek relief as a "person" pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons" have standing) and under Pennsylvania law.

### B.    Defendant

24.    Defendant McKinsey and Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017.

25.    McKinsey is a worldwide management consultant firm. From approximately 2004-2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize sales

7

of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has provided related consulting services to other manufacturers of opioids.

### III.  JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action because the Plaintiff brings a federal cause of action that raises a federal question pursuant to 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

27.     This Court also has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a) because the Plaintiff is a "citizen" of the Commonwealth, Defendant is a citizen of a different state and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

28.     This Court has personal jurisdiction over McKinsey because at all relevant times, McKinsey purposely availed itself of the privilege of doing business in the Commonwealth and in this District, including by engaging in the business of researching, designing, and implementing marketing and promotion strategies for various opioid manufacturers, including Purdue, that were intended to be, and were, implemented in, or whose implementation had a substantive and intended effect in, Pennsylvania and this District, among other places.  McKinsey purposefully directed its activities at the Commonwealth, and the claims herein arise out of those activities.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in, were directed to, and/or emanated from this District.

## IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

30.     This lawsuit concerns McKinsey's work for Purdue Pharma and its owner, the Sackler family, in the years after the 2007 investigation and subsequent guilty plea relating to Purdue's sales and marketing strategy for its opioids, as well as its work for other opioid manufacturers, distributors, and pharmacies.

31.     McKinsey had an ongoing relationship with Purdue beginning as early as 2003 and lasting decades. By June 2009 McKinsey was advising Purdue on precisely the same sales and marketing strategy and practices for OxyContin that were the subject of the Corporate Integrity Agreement. McKinsey continued this work after the expiration of the Corporate Integrity Agreement and at least through November of 2017.

32.     After McKinsey's marketing strategies tripled OxyContin sales, McKinsey gave similar advice to other opioid manufacturers, and advised participants in virtually every aspect of the opioid supply chain, including opioid distributors and pharmacies.

### A.     Purdue Pleads Guilty to Misbranding OxyContin and Enters into a Corporate Integrity Agreement

33.     On May 10, 2007, the Purdue Frederick Company, Purdue's parent, as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq.

34.     Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

35.     Concurrent with the guilty plea by the Purdue Frederick Company, Purdue entered into a Corporate Integrity Agreement with the Office of Inspector General of HHS on May 7, 2007.

Purdue's compliance obligations under the Corporate Integrity Agreement ran for a period of five years, expiring on May 10, 2012.

36.     Pursuant to the Corporate Integrity Agreement, Purdue was obligated to implement written policies regarding its compliance program and compliance with federal health care program and Food and Drug Administration requirements, including:

- "selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate … including, but not limited to information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;

- compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products;

- the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from HCP's [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products," including "the form and content of Materials disseminated by sales representatives," and "the internal review process for the Materials and information disseminated by sales representatives."

37.     Purdue was also obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the Corporate Integrity Agreement, and to file compliance reports on an annual basis with the inspector general.

**B.     Purdue Hires McKinsey to Boost Opioid Sales to Circumvent the and Corporate Integrity Agreement**

38.     The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sackler family members occupied either six or seven of the seats on Purdue's board of directors, and at all times held a majority of board seats. To advise the board of directors of Purdue was to advise the Sackler family. The interests of

the Sackler family and the Purdue board of directors, and Purdue itself, as a privately held company, are all aligned. Practically, they are indistinguishable.[6]

### 1. The Sacklers Distance Themselves from Purdue

39.     After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business. On April 18, 2008, Richard Sackler, then the co-chairman of the board of directors along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was "a dangerous concentration of risk." Richard Sackler recommended a strategy of installing a loyal CEO of Purdue who would safeguard the interests of the Sackler family, while at the same time positioning Purdue for an eventual sale by maximizing OxyContin sales.

40.     In the event that a purchaser for Purdue could not be found, Richard stated Purdue should "distribute more free cash flow" to the Sacklers to maximize the amount of money the owner could take out of the business. It is, in other words, an acknowledgement that Purdue's reputation and franchise was irrevocably damaged, and that Purdue's opioid business was not sustainable in the long term.

41.     By 2017, with the hope for any acquisition now gone, the Sacklers' decision to milk opioid profits by "distributing more free cash flow" on the way down had its natural effect on Purdue. Landau, then the CEO, stated, "the planned and purposeful de-emphasis and deconstruction of R&D has left the organization unable to innovate."

---

[6] Craig Landau ("Landau"), soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO of the company, in other words, understood that he would have little practical power despite his new title. The owners ran the business.

42.     In fact, in the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue as possible: $300 million. That amount was required to be retained by Purdue pursuant to a partnership agreement with a separate company. Otherwise, all the money was distributed to the owners.[7]

43.     Concurrently, the Sacklers backed away from day-to-day jobs at Purdue. During the ongoing investigation that resulted in the 2007 guilty pleas, "several family members who worked at Purdue stepped back from their operational roles."[8] In 2003, Richard Sackler himself resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler chose to exit their roles as senior vice presidents. Mortimer D.A. Sackler quit being a vice president. They remained on the board of directors, however.

44.     At the time Richard Sackler communicated these plans to distance the family from Purdue, the Sacklers had already established a second company, Rhodes Pharmaceuticals L.P. ("Rhodes"). The Sacklers established Rhodes four months after the 2007 guilty plea.[9] Rhodes' purpose was to sell generic versions of opioids. It was, in other words, a way for the Sacklers to continue to make money off opioids while separating themselves from Purdue. By 2016, Rhodes held a larger share of the opioid market than Purdue. Through Purdue, the Sacklers controlled 1.7% of the overall opioid market. When combined with Rhodes, however, the Sacklers' share of the overall opioid market was approximately 6% of all opioids sold in the United States.[10]

---

[7] *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, WALL ST. J. (June 30, 2019), https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-11561887120?mod=hp_lead_pos6.

[8] Barry Meier, *Pain Killer* 167 (2018).

[9] *Billionaire Sackler family owns second opioid maker*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132.

[10] *Id.*

2.     **Purdue Hires McKinsey to Devise and Implement an OxyContin Sales Strategy Consistent with the Sacklers' Goals**

45.     The Sacklers faced a problem: the need to grow OxyContin sales as dramatically as possible so as to make Purdue an attractive acquisition target or borrower, while at the same time appearing[11] to comply with the Corporate Integrity Agreement.

Purdue and the Sacklers were well aware of the constraints posed by the Agreement. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to whether Purdue should have a single sales force marketing all Purdue products, including OxyContin, or instead to "create a separate Sales Force for Intermezzo (a sleeping pill) that would be comprised of approximately 300 representatives." John Stewart ("Stewart"), the Sacklers' chosen CEO for Purdue at the time, saw an opportunity, and asked if the Corporate Integrity Agreement would apply if Purdue were to launch Intermezzo and another Purdue product, Ryzolt (a branded version of Tramadol, another narcotic painkiller), using the separate sales force. Might the new drug launch fall outside of the Corporate Integrity Agreement, he asked.[12] Bert Weinstein, Purdue's Vice President of Compliance, advised that it would not.[13]

46.     Given the tension between compliance with the Corporate Integrity Agreement and the desire to sell more OxyContin, Purdue needed help. Ethan Rasiel, a former McKinsey consultant, has described the typical way McKinsey begins working with a client: "An organization has a problem that they cannot solve with their internal resources. That's the most

---

[11] As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change – the way the sales force was managed and incentivized, everything stayed the same." *David Crow, How Purdue's 'one-two' punch fuelled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[12] Purdue Executive Committee Meeting Notes and Actions, at 2 (May 20, 2009).

[13] *Id.*

classic way that McKinsey is brought in."[14] Such was the case with Purdue. Because it did not have the internal resources to address the problems posed by the Corporate Integrity Agreement, Purdue hired McKinsey to devise a sales and marketing strategy to increase opioid sales.

47.     Purdue's Executive Committee discussed CEO Stewart's concerns regarding the constraints posed by the Corporate Integrity Agreement on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin.

48.     Consistent with their plan to dissociate themselves from the company, the Sacklers appointed Stewart as the CEO of Purdue in 2007 and paid him more than $25 million for his services to Purdue from 2007 through 2013. The Sacklers viewed Stewart as someone loyal to the family. He had previously worked for a division of Purdue in Canada. Stewart's job was to assist the Sacklers with the divestiture or eventual orderly wind-down of Purdue.

49.     As CEO, Stewart was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey and required his personal approval for any work orders with McKinsey. In addition, Purdue's Vice President of Corporate Compliance, "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in the [Corporate Integrity Agreement]," reported directly to Stewart.

50.     Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue board of directors, controlled by the Sackler family.

---

[14] *How McKinsey Became One of the Most Powerful Companies in the World*, YOUTUBE (June 6, 2019), https://www.youtube.com/watch?v=BBmmMj_maII.

51.     McKinsey also worked in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia ("Gasdia"), Vice President of Sales and Marketing.

52.     From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate its sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the ***creation*** of an OxyContin sales strategy, but also its ***implementation***.

      **C.**    **What McKinsey Does: "Consulting Is More than Giving Advice"**

53.     Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad range of activities, and the many firms and their members often define these practices quite differently."[15]

54.     Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. A strategy consultant provides a plan to the client that the client may choose to adopt.

55.     "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" involves helping the client adopt the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and execute on the plan.

56.     In his 1982 *Harvard Business Review* article entitled "Consulting is More Than Giving Advice," Professor Arthur Turner of the Harvard Business School described the then-

---

[15] Arthur Turner, *Consulting is More Than Giving Advice*, HARV. BUS. REV. (Sept. 1982), https://hbr.org/1982/09/consulting-is-more-than-giving-advice.

current state of the consulting industry's attitude toward implementation work: "The consultant's proper role in implementation is a matter of considerable debate in the profession. Some argue that one who helps put recommendations into effect takes on the role of manager and thus exceeds consulting's legitimate bounds. Others believe that those who regard implementation solely as the client's responsibility lack a professional attitude, since recommendations that are not implemented (or implemented badly) are a waste of money and time. And just as the client may participate in diagnosis without diminishing the value of the consultant's role, so there are many ways in which the consultant may assist in implementation without usurping the manager's job."[16]

57.     A core component of the McKinsey relationship is discretion. "The basis of any client relationship with the firm is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work."[17]

58.     Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the overall suite of services that McKinsey provided within the "transformational relationship" McKinsey developed with its clients.[18]

59.     Describing McKinsey's approach to implementation, one McKinsey consultant stated, "On some of the most successful engagements I've seen, you can't even tell the difference

---

[16] *Id.*

[17] McDonald, *The Firm*, at 308.

[18] For   McKinsey's own description of its implementation services, *see* https://www.mckinsey. com/business-functions/mckinsey-accelerate/how-we-help- clients/implementation (last visited Jan. 5, 2021).

between a McKinsey team member and one of our clients because we're working that cohesively together."[19]

60.     Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[20]

61.     In the broadest of generalities, then, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once the objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit to implement the necessary means to achieve those objectives for the client.

62.     Indeed, long after McKinsey's advice to Purdue was accepted and deployed as the theme of Purdue's 2014 national sales strategy, McKinsey remained with Purdue to assure proper implementation of McKinsey's strategies to maximize OxyContin sales.

### D.     Purdue Relied on McKinsey

63.     McKinsey is not hired to advise on trivial matters. It is a corporate mandarin elite, likened to the Marines or the Jesuits.[21] United States Senator Mitt Romney, during his presidential campaign in 2012, told the editorial board of *The Wall Street Journal* that as president he would approach reducing the size of the government by hiring McKinsey. A former consultant himself, Romney stated, "So I would have … at least some structure that McKinsey would guide me to put

---

[19] McKinsey on Implementation, YOUTUBE (Apr. 30, 2017), https://www.youtube.com/watch?v=rEQOGVpl9CY.

[20] *Id.*

[21] Said one former McKinsey partner to *BusinessWeek* in 1986: "There are only three great institutions left in the world: The Marines, the Catholic Church, and McKinsey." McDonald, *The Firm*, at 165.

in place." In response to audience surprise, Romney said, "I'm not kidding. I would probably bring in McKinsey."[22]

64.     McKinsey is not cheap, either. A client does not choose to pay McKinsey unless it expects to receive results it could not have obtained within its own organization. McKinsey offers solutions to clients facing challenges they feel they cannot adequately address on their own.

65.     McKinsey has long touted the notion of the "transformational relationship." It is the goal of every client relationship McKinsey develops, and, McKinsey argues, the best way to extract value from a client's use of McKinsey's services.

66.     At its core, the "transformational relationship" is long-term. It is the antithesis of a one-off contract wherein McKinsey performs one discreet project for a client and then concludes its business. Rather, "once McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but actually creates more of it."[23] The long-term result can be "dependence" on the McKinsey consultants.

67.     This strategy of insinuating itself into all aspects of its clients' business proved enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its consultants to take with clients to great effect:

---

[22] McDonald, *The Firm*, at 1.

[23] *Id*. at 6. Purdue provides a fine example of this feedback loop in action. In 2008, when McKinsey was advising Purdue regarding Risk Evaluation and Mitigation Strategies (REMS) for OxyContin required by the FDA, McKinsey partner Maria Gordian wrote to fellow partners Martin Elling ("Elling") and Rob Rosiello ("Rosiello") regarding progress in the "REMS work" as well as "Broader Strategy work." Regarding the latter, Gordian noted that Purdue board members Jonathan Sackler and Peter Boer "basically 'blessed' [Landau] to do whatever he thinks is necessary to 'save the business.'. . . *I believe there is a good opportunity to get another project here*." (emphasis added).

Indeed, after the REMS work was completed, McKinsey continued to work on "Broader Strategy work" for another decade.

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players in the world, McKinsey rarely left, ensuring a steady and growing flow of billings for years if not decades. In 2002, for example, BusinessWeek noted that at that moment, the firm had served four hundred clients for fifteen years or more.[24]

68.     Purdue was no different. McKinsey counted Purdue as a client at least as early as 2004. The precise duration of the relationship between McKinsey and Purdue and its owners has not been ascertained, although it is known that McKinsey worked with Purdue for years before Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007, and that by June 2009 McKinsey was actively working with Purdue to increase OxyContin sales in light of that guilty plea and its accompanying Corporate Integrity Agreement. The work continued through at least 2018.

69.     McKinsey partner Maria Gordian, in her March 26, 2009 "EY 2009 Impact Summary" internal report to McKinsey Director Olivier Hamoir and McKinsey's Personnel Committee, recounted her accomplishments that year on the Purdue account. The document is an annual self-assessment produced by McKinsey partners. In it, Gordian described the state of firm's relationship for Purdue:

> With client work extending through the 3rd quarter, and several additional proposals in progress, we continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family and serving them on key business development issues, and to expanding our relationship with [John] Stewart and other members of the senior management team.

70.     McKinsey staffed at least 36 known consultants to Purdue, from senior partners all the way down through engagement managers to entry-level associates. Throughout the unfolding of the nationwide opioid crisis that only continued to worsen after the 2007 guilty plea, McKinsey remained steadfast alongside the Sacklers and Purdue every step of the way.

---

[24] *Id.* at 136.

**E.      McKinsey Delivered Granular Growth Opportunities for OxyContin**

71.      By 2009, McKinsey was working with its long-time client, Purdue, to craft and implement a sales and marketing plan to increase OxyContin sales in light of the Corporate Integrity Agreement and Purdue's diminishing outlook.

72.      In June 2009, McKinsey advised Purdue senior management, including Landau, then the Chief Medical Officer ("CMO") and future CEO, regarding a variety of strategies to increase Purdue's opioid sales that were developed using McKinsey's expertise and proprietary approaches to problem solving.

73.      McKinsey prides itself on certain managerial techniques it professes to have detailed knowledge of and expertise in deploying. These techniques are generally applicable to problems encountered by many businesses; they are conceptual frameworks that McKinsey deploys when tasked with solving a problem for a client.

74.      After the first guilty plea, the Sacklers desired dramatic, short-term growth of Purdue's opioid sales so as to increase the company's attractiveness as an acquisition target or borrower while allowing the Sacklers to take money out of the company. One service McKinsey offers to its clients is to tell them how to grow.

75.      In order to identify growth opportunities for a client, McKinsey espouses a "granular" approach to identifying which subsets of the client's existing business are the sources of growth and exploiting them for all they are worth. In August 2008, McKinsey Directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter: The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company

20

Performance (2008). "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[25]

76.     Previously, in an article in the McKinsey Quarterly (coincidentally published the same month that Purdue pled guilty), the authors explained:

> Our research on revenue growth of large companies suggest that executives should 'de-average' their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[26]

77.     Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[27]

78.     One can imagine this strategy applied to a seller of, say, cartons of milk. If McKinsey were to perform an analysis of the milk seller's sales and marketing and discovers that the profit margin on milk cartons sold to university cafeterias in dairy-producing states is much greater than the margin on cartons sold at convenience stores in the southwest, and further that the milk seller has previously devoted equal amounts of time and resources selling to both university cafeterias and convenience stores; then McKinsey would likely advise the client to deploy additional resources towards selling milk to university cafeterias in dairy-producing states.

---

[25] *The  granularity of growth*, Book Excerpt, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

[26] Mehrdad Baghai et al., *The granularity of growth*, MCKINSEY Q. (May 1,2007), https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth.

[27] *Id.*

McKinsey's "granular" approach to the milk seller's business channels has identified a way to increase higher margin sales, leading to newfound growth for the client.

79.     Rather than milk, McKinsey deployed this strategy on OxyContin, a controlled substance, after its manufacturer pled guilty to misrepresenting the addictive and deadly properties of the drug.

80.     McKinsey's granular analysis of Purdue's OxyContin sales efforts led to the implementation of a number of strategies to sell more pills.

81.     By January 2010, McKinsey informed Purdue that, in accordance with the tenants of its granular growth analysis, Purdue could generate "$200,000,000 to $400,000,000" in additional annual sales of OxyContin by implementing McKinsey's strategies.

82.     In June of 2012, Stewart assigned McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales."

83.     McKinsey did that in excruciatingly granular detail, analyzing each sales channel for Purdue's opioids for weaknesses and opportunities. For instance, McKinsey informed the Sacklers that "deep examination of Purdue's available marketing purchasing data shows that Walgreens has reduced its units by 18%." Further, "the Walgreens data also shows significant impact on higher OxyContin doses." In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers. In addition, McKinsey suggested the use of opioid savings cards distributed in neighborhoods with Walgreens locations to encourage the use of Purdue's opioids despite Walgreens' actions.

84.     The themes of McKinsey's work were crystallized in a series of presentations and updates made to the Sackler family and Purdue's board of directors in the summer of 2013 entitled "Identifying Granular Growth Opportunities for OxyContin."

### a.     Marketing – Countering Emotional Messages

85.     From the outset of McKinsey's known work for Purdue, the work was grim. In June of 2009, McKinsey teamed with Purdue's CMO (and current CEO) Landau and his staff to discuss how best to "counter emotional messages from mothers with teenagers that overdosed in [sic] OxyContin."

86.      Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

87.     These marketing claims were tailored to avoid any pitfalls that the Corporate Integrity Agreement might hold. While nonetheless false and misleading, these claims regarding "freedom" and "peace of mind" of OxyContin users were narrowly tailored in order to avoid representations regarding "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in Section III.B.2.c of the Corporate Integrity Agreement.

88.     Purdue's marketing materials from that time period illustrate McKinsey's approach:[28]

---

[28] *State of Tenn. v. Purdue Pharma L.P.*, No. 1-173-18, Complaint at ¶24 (Tenn. Cir. Ct. May 15, 2018).



89.    In addition, McKinsey suggested the tactic of "patient pushback," wherein McKinsey and Purdue would foment patients to directly lobby their doctors for OxyContin when those physicians expressed reservations regarding the administration of Purdue's opioids.

**b.    Targeting – Selling More OxyContin to Existing High Prescribers**

90.    Perhaps the key insight McKinsey provided was, using its granular approach, to identify historically large prescribers and target ever more sales and marketing resources on them.

91.    On January 20, 2010, Purdue's board of directors was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey analyzed the opioid prescribing patterns of individual physicians to identify those that had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz to encourage even further prescribing.

92.     Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

93.     Many of the historically highest prescribers of OxyContin—those same individuals that McKinsey urged Purdue to target for ever more prescriptions—had prescribed Purdue's OxyContin *before* the 2007 guilty plea and had already been subjected to Purdue's misrepresentations regarding OxyContin that were the subject of that guilty plea.

94.     McKinsey identified these physicians—those that had already been influenced by Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a massive marketing push to sell more OxyContin.

95.     McKinsey worked assiduously with Purdue over many years to continually refine this approach and requested ever-more granular data for its analysis. More than three years after the initial introduction of the physician segmentation initiative, McKinsey requested, and Purdue provided, "prescriber-level milligram dosing data" so that they could further analyze the individual amounts of OxyContin prescribed by individual physicians.

96.     At the same time, it requested this "prescriber-level milligram dosing data" from Purdue, McKinsey urged the Sacklers to strictly manage the target lists of each sales representative to ensure that the maximum amount of each sales representative's time was spent with the most attractive customers.

97.     On July 23, 2013, Purdue's Board of Directors discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline in "tablets per Rx." In order to assure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."

25

98.     In unveiling *Project Turbocharge* to Purdue and the Sacklers, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers, and urged Purdue and the Sacklers to "make a clear go-no-go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.

99.     McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write.

100.    By November 2013, McKinsey had obtained the physician-level data it previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to physicians. Purdue's Board of Directors was kept apprised of McKinsey's progress.

### c.     Titration – Selling Higher Doses of OxyContin

101.    McKinsey understood that Purdue would make more money if it sold higher dosage strengths for OxyContin. Of course, higher dosage strengths, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

102.    Consistent with its granular growth analysis, as early as October 26, 2010 McKinsey advised the Sacklers and the Purdue board of directors that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which increased the sales of the highest (and most profitable) doses of OxyContin.

103.    McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013, that Purdue had identified weakness in prescribing rates among the higher doses of OxyContin, and reassured the Sacklers that "McKinsey would analyze the data down to the level

of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.

104.    Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

### d.    Covered Persons – Sales Quotas and Incentive Compensation

105.    McKinsey urged the use of quotas and bonus payments to motivate the sales force to sell as many OxyContin prescriptions as possible.

106.    Notably, this behavior was contemplated by the 2007 Corporate Integrity Agreement, which required Purdue to implement written policies regarding "compensation (including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives *do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products*." (emphasis added).

107.    By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy, to dramatically increase the quota of required annual sales visits by Purdue sales representatives to prescribers. The quota was 545,000 visits in 2010; 712,000 visits in 2011; 752,000 in 2012; and 744,000 visits in 2013.

108.    On August 8, 2013, as part of their "Identifying Granular Growth Opportunities for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal (e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."

109.    In its "Identifying Granular Growth Opportunities for OxyContin" presentation to the Purdue board of directors in July 2013, McKinsey nonetheless urged Purdue, in addition to

increasing the focus of the sales force on the top prescribers, to also increase the overall quotas for sales visits for individual sales representatives from 1,400 to 1,700 annually.

110.   In 2013, McKinsey identified one way that Purdue could squeeze more productivity out of its sales force: by slashing *one third* of the time devoted to that Purdue devoted to training its sales force (from 17.5 days per year to 11.5 days):



**One possible way to attain benchmark ~1500 calls per year is to decrease training days by ~6 days and increase calls per day by 5%**  ☐ One possible route to benchmark

| Current call activity | | Potential new allocation | |
| --- | --- | --- | --- |
| Number of "on territory" days per year | | Number of "on territory" days per year | |
| Item | Days[1] | Item | Days[1] |
| Number of working days | 260 | Number of working days | 260 |
| Holidays | -11.3 | Holidays | -11.3 |
| Vacation and other time off | -27.2 | Vacation and other time off | -27.2 |
| Trainings and meetings | -17.5 | Trainings and meetings | -11.5 |
| Other company-related time off of field | -4.3 | Other company-related time off of field | -4.3 |
| Total days | 199.7 | Total days | 205.7 |
| Avg calls per day | x   7 | Avg calls per day | x   7.35 |
| Total calls per year | 1398 | Total calls per year | 1512 |

1 Purdue 2012 Actual data was used for this analysis

SOURCE: Purdue; team analysis                                                McKinsey & Company | 59

111.   By eliminating one third of the amount of time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of physical calls per day out of its newly less-trained sales force.

112.   Additionally, McKinsey advised Purdue on how to craft incentive compensation for the sales representatives, who were Covered Persons pursuant to the Corporate Integrity Agreement. McKinsey knew that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives based on the number of

OxyContin prescriptions the representative produced could be a powerful driver of incremental OxyContin sales.

        **e.**      **Increasing the Overall Size of the Opioid Market: The Larger the Pie, the Larger the Slice**

113. Consistent with McKinsey's mandate, Purdue incentivized its sales staff "to increase not just sales of OxyContin but also generic versions of extended release oxycodone." Typically, one would not wish to encourage the sales of generic competitors that offer a similar product to your own. If, however, your goal is to position a company so as to look like an attractive acquisition target, the growth of the overall opioid market is just as important as one's own market share: "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market."[29]

114. Notably, this notion that the size of a company's market share is not as important as the size of the *overall* market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities. Describing their authors' conclusions in The Granularity of Growth, McKinsey stated, "One of their most surprising conclusions is that increased market-share is seldom a driver of growth. They contend, instead, that growth is driven by where a company chooses to compete: which market segments it participates in … the key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[30]

---

[29] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[30] *The granularity of growth*, Book Excerpt, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

115.    In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[31] "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with the HHS.[32] McKinsey designed this plan.[33]

### F.    Purdue Implemented McKinsey's Strategies

116.    With McKinsey's ongoing assistance, Purdue implemented McKinsey's strategies for selling and marketing OxyContin.

117.    For instance, in January 2010, Purdue was training its sales and marketing force on the new sales tactics based on a "physician segmentation" initiative that McKinsey urged. The strategy developed as a result of McKinsey's granular analysis of OxyContin sales channels. The initiative sought to identify the most prolific OxyContin prescribers and then devote significant resources towards convincing those high prescribers to continue to prescribe even more OxyContin, in higher doses, for longer times, to ever more patients.

---

[31] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[32] *Id.*

[33] Worth noting is that this strategy of increasing overall opioid sales directly benefitted the Sacklers through their ownership of Rhodes. Especially worth noting is that this strategy also benefitted McKinsey's other opioid clients, such as Johnson and Johnson. "They have a huge amount of inside information, which raises serious conflict issues at multiple levels," stated a former consultant, referring to McKinsey's influential role as advisor to multiple participants in a given industry, such as opioid manufacturing. It "puts them in a kind of oligarchic position." Michelle Celarier, *The Story McKinsey Didn't Want Written*, INSTITUTIONAL INV. (July 8, 2019), https://www.institutionalinvestor.com/article/b1g5zjdcr97k2y/The-Story-McKinsey-Didn-t-Want-Written.

For example, in an August 15, 2013 presentation to Purdue management entitled "Identifying OxyContin Growth Opportunities," McKinsey noted that "McKinsey's knowledge *of the ways other pharma companies operate* suggests Purdue should reassess the roles of MSL and HECON Groups – and further drive the salesforce to be more responsive to formulary coverage changes." (emphasis added).

118.    On January 20, 2010, the Purdue board of directors was informed of the progress in implementing McKinsey's "physician segmentation" initiative.

119.    This collaboration continued over the course of the relationship between Purdue and McKinsey.

120.    During the time that McKinsey was advising Purdue, Purdue deliberately minimized the importance of the Corporate Integrity Agreement. In 2008, Carol Panara joined the Purdue sales force from rival Novartis. She would stay with the company until 2013, during which time McKinsey was responsible for increasing OxyContin sales at Purdue and culminating with the implementation of McKinsey's "Project Turbocharge," beginning September 2013.

121.    Ms. Panara stated that the 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, 'we were sued, they accused us of mis-marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine.' You had the impression they were portraying it as a bit of a witch hunt."[34] (Purdue and its executives paid $634.5 million in fines.)

122.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to sell OxyContin to doctors while at the same time maintaining technical compliance with the Corporate Integrity Agreement: Ms. Panara stated that, though she was told she could not flatly claim that OxyContin was better or safer than other opioids, "she was trained to talk about products in ways that implied that it was safer." She might tout OxyContin's 12-hour formulation to a prescriber. "You could say that with a shorter-acting medication that wears off after six hours, there was a greater chance the patient was going to jump their dosing schedule and take an extra

---

[34] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

one a little earlier. We couldn't say [it was safer], but I remember we were told that doctors are smart people, they're not stupid, they'll understand, they can read between the lines."[35]

### 1. Project Turbocharge

123.    In 2013, the year after the Corporate Integrity Agreement expired, McKinsey urged a number of transformational sales and marketing tactics further boosted OxyContin sales. McKinsey described these tactics to the Purdue Board of Directors in a series of updates entitled "Identifying Granular Growth Opportunities for OxyContin" in July and August of 2013.

124.    McKinsey dubbed their overall sales and marketing strategy for Purdue "Project Turbocharge," and urged the Sackler family and the board of directors to adopt it.

125.    The Sacklers were impressed with McKinsey's work. On August 15, 2013, Richard Sackler emailed Mortimer D.A. Sackler, "the discoveries of McKinsey are astonishing."

126.    Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family— not the Purdue board of directors—in order to pitch Project Turbocharge. Dr. Arnab Ghatak ("Ghatak"), one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner Elling in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] . . . We went through exhibit by exhibit for about 2 hrs . . . They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations."

127.    Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

---

[35] *Id.*

128. As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and re-christened the initiative the decidedly more anodyne "E2E: Evolve to Excellence."[36]

129. Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales Meeting.

130. CEO Stewart also told sales staff that board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process," referring to McKinsey's plan.

131. After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Gasdia during Purdue's implementation of McKinsey's recommendations.

132. In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

133. At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board of directors discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

---

[36] Regarding the name change, CEO Stewart wrote to McKinsey partners Rosiello and Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive 'turbocharge' process – *though we do need to find a better and more permanently appropriate name*." (emphasis added).

134.    McKinsey's Project Turbocharge, now re-named Evolve to Excellence, called for a doubling of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional spending had already skyrocketed. McKinsey's influence on Purdue's operations after the 2007 guilty plea is stark:



135.    At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project Turbocharge had been implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million per quarter, an increase of *800%*.

136.    Project Turbocharge continued despite the arrival of a new CEO at Purdue. On January 17, 2014, new CEO Mark Timney received reports from McKinsey emphasizing that, in

order to increase profits, Purdue must again increase the number of sales visits to "high-value" prescribers, i.e., those that prescribe the most OxyContin.[37]

137.    McKinsey also urged, consistent with their granular approach, that sales representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling Butrans, another Purdue product. Previously, the split had been fifty-fifty.

138.    Purdue implemented McKinsey's suggestion.

### G.    McKinsey's Efforts Triple OxyContin Sales

139.    Purdue got what it wanted out of McKinsey. Between the years of 2008 through 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million distributed in 2010 alone.

140.    These distributions would not have been possible without the McKinsey's work dramatically increasing OxyContin sales.

141.    The Sacklers were aware of the value McKinsey provided: on December 2, 2013, CEO Stewart informed Kathe Sackler and Vice President of Sales and Marketing Gasdia that Project Turbocharge "was already increasing prescriptions and revenue." Crucially, these results

---

[37] In fact, deposition testimony suggests McKinsey may have even been responsible for the fact that Timney was given the CEO job at Purdue in the first place. On October 30, 2020, Timney provided the following testimony:

> Q: Are you familiar with McKinsey & Company?
>
> A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.
>
> Q: Did individuals at McKinsey assist you in getting hired as the CEO of Purdue?
>
> A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding. (emphasis added).

were already being realized before the strategy was fully deployed as the theme of the 2014 National Sales Meeting.

142.    McKinsey's contributions to Purdue's growth after 2007 are remarkable. OxyContin sales should have naturally declined: The Department of Justice identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of HHS entered into a Corporate Integrity Agreement whereby Purdue was monitored to assure that those sales did not continue.

143.    In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.[38]

144.    The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion: a tripling of revenue from OxyContin sales.[39]

145.    Under McKinsey's guidance, OxyContin sales peaked in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[40] That OxyContin sales peaked in 2013 is especially notable, given that overall opioid prescriptions had already peaked three years earlier, in 2010.[41] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

---

[38] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[39] *Id.*

[40] Phil McCausland & Tracy Connor, *OxyContin maker Purdue to stop promoting opioids in light of epidemic*, NBC NEWS (Feb. 10, 2018), https://www.nbcnews.com/storyline/americas-heroin-epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726.

[41] Gery P. Guy Jr, et al., Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015, MORB. MORTAL WKLY. REP. (July 7, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.

146.    By 2018, with OxyContin sales in their inexorable decline, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The ranks of sales representatives were cut back to 200 people – the approximate size of Purdue's sales staff prior to the initial launch of OxyContin.

147.    In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater than 60 milligrams per day.

### H.    McKinsey Was Aware of the Devasting Effects of Opioids and Continued to Provide Marketing Consulting.

148.    McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. In 2003, when McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson ("Pearson"). Pearson worked for McKinsey for 23 years and was a member of the firm's shareholder council (McKinsey's equivalent of a board of directors) in addition to leading PMP before departing McKinsey in 2008 to helm Valeant Pharmaceuticals.[42]

149.    Pearson stated, "At McKinsey pharmaceuticals was one of our biggest industry groups."[43] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was

---

[42] John Gapper, *McKinsey's fingerprints are all over Valeant*, FIN. TIMES (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.

Notably, Rosiello, a McKinsey partner who was a co-lead of the Purdue account, went on to join Pearson at Valeant Pharmaceuticals in 2015 as Chief Financial Officer.

[43] Michael Peltz, Mike Pearson's New Prescription for the Pharmaceuticals Industry, INSTITUTIONAL INV. (Sept. 3, 2014), https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry.

loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp elbowed.'"[44]

150.    Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

151.    McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals.

152.    In 2012, while advising Purdue, McKinsey described its health care capabilities thusly: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

153.    By the time McKinsey was working with Purdue on sales and marketing in 2009, it already had extensive experience with opioids in particular. As early as 2002, McKinsey was advising other opioid manufacturers regarding methods to boost sales of their drugs. For example, on March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson regarding

---

[44] John Gapper, *McKinsey's fingerprints are all over Valeant*, FIN. TIMES (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.

how to market their opioid Duragesic to "[t]arget high abuse-risk patients (e.g., males under 40)". One of the recommendations McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing efforts on doctors that were already prescribing large amounts of Purdue's OxyContin.[45]

154. As early as 2002 McKinsey had such intricate knowledge of the sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with OxyContin, specifically, that it was able to recommend to *a competitor of Purdue* that it boost its own opioid sales by *following in the footsteps of Purdue*.

155. What is more, on September 13, 2013 McKinsey briefed Purdue on the ongoing concerns regarding OxyContin addiction and diversion among prescribers:



---

[45] Chris McGreal, *Johnson & Johnson faces multibillion opioids lawsuit that could upend big pharma*, THE GUARDIAN (June 23, 2019), https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial.

156.    In a PowerPoint slide entitled "Findings on messaging and positioning," part of a presentation to Purdue entitled "OxyContin growth opportunities: Phase 1 Final Report: Diagnostic," McKinsey noted that "most prescribers are concerned about abuse," and that "most physicians do not feel that [OxyContin] reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."

157.    In February 2009, only months prior to McKinsey's first known work for Purdue,[46] Dr. Art Van Zee, in his peer-reviewed article in the American Journal of Public Health entitled "The promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy," stated the matter plainly: "***Compared with noncontrolled drugs, controlled drugs, with their potential for abuse and diversion, pose different public health risks when they are overpromoted and highly prescribed***." (emphasis added). By 2004, "OxyContin had become the most prevalent prescription opioid in the United States."[47]

158.    Further, Dr. Van Zee identified the precise tactics that McKinsey deployed for Purdue as a source of OxyContin misuse and abuse, and suggested that regulation may be appropriate to curtail its use: "The use of prescriber profiling data to target high-opioid prescribers – coupled with very lucrative incentives for sales representatives – would seem to fuel increased

---

[46] In a 2013 presentation to Purdue's CEO and Vice President of Sales and Marketing, McKinsey referenced McKinsey's "prior experiences serving Purdue that go back 10 years." Presentation by McKinsey to John Stewart and Russell Gasdia entitled *Identifying granular growth opportunities for OxyContin: First Board Update*, at 2 (July 18, 2013).  While McKinsey's relationship with Purdue dates back to approximately 2003, the earliest known details of its work for Purdue date to June 2009. What McKinsey did for Purdue before 2009 is not presently known.

[47] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99 AM. J. PUB. HEALTH 221, 221, 224 (Feb. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf.

prescribing by some physicians – perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."[48]

159.    If McKinsey was not aware of the adverse consequences of OxyContin, the drug it was paid to sell, such ignorance could not survive the granular reality of its relationship with Purdue. In June 2009, the earliest known work McKinsey performed for Purdue consisted of "countering the emotional messages from mothers with teenagers that overdosed on OxyContin."

160.    Another indication that OxyContin sales should not be turbocharged: during McKinsey's work for Purdue, Purdue was unable to purchase product liability insurance to cover its practice of selling OxyContin.

161.    McKinsey's method of aggressive marketing of opioids to prescribers has demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[49]

162.    These dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge was implemented at Purdue.

_____

[48] *Id.*

[49] Scott E. Hadland et al., *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related Overdoses*, 2 JAMA NETWORK 1 (Jan. 18, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914.

163.    The study noted "physician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."[50]

164.    The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, *the number of marketing interactions with physicians demonstrated a stronger association with mortality* than the dollar value of marketing."[51] (emphasis added).

I.    **McKinsey Continued Advising Purdue to Increase the Sale of Opioids Despite theNationwide Epidemic.**

165.    On October 23, 2017, the president of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

166.    Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its board of directors. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: paying money – "rebates" – to health insurers whenever someone overdosed on Purdue's drug.

167.    Once again, in perfect McKinsey parlance,[52] these payments for future OxyContin overdoses were christened "Event-Based contracts." To wit:

---

[50] *Id.*

[51] *Id.*

[52] "Consultant-ese," when applied to work as grim as maximizing opioid sales in the face of a national disaster, led one former McKinsey consultant to state: "This is the banality of evil, M.B.A. edition." Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, N.Y. TIMES (Nov. 27, 2020), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.



168.    Helpfully, McKinsey provided estimates for the future costs of these "events."[53] McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal."

169.    A "meaningful" amount, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs:

---

[53] McKinsey defined an "event" as "first occurrence for overdose or opioid use disorder."



170.    The money was to be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances would not go to the individuals afflicted, nor the estates of the dead.

171.    It is little surprise, then, that McKinsey was concerned with its legal liability for this work. Within months of recommending "event-based contracts" to Purdue, Elling raised this concern with Ghatak and suggested corrective action: destroying evidence.

Message
_____

From:       Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
            (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI]
Sent:       7/4/2018 12:10:13 PM
To:         A G [drarnabghatak@gmail.com]
Subject:    Re: [EXT]Re: Howdy


Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
>> Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
>> should be doing anything other that eliminating all our documents and emails.  Suspect not but as things
>> get tougher there someone might turn to us.  M
>>
>> +=========================================================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it.  Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +=========================================================================+

172.    Elling's prediction that things would "get tougher" for Purdue would prove

prescient.

### 1.    Purdue Pleads Guilty Once Again

173.    On October 20, 2020, Purdue—McKinsey's co-conspirator—agreed with the

United States Department of Justice to plead guilty to improper marketing of OxyContin and other

opioids again. This time the plea agreement concerned conduct from 2010 to 2018.

174.    Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United

States and to violate the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331, 353, among other

charges, relating to its opioid sales and marketing practices after the 2007 guilty plea.

175.    The new plea agreement does not identify Purdue's co-conspirators, and McKinsey

is not identified by name in the agreement. Instead, McKinsey is referred to as the "consulting

company."

176. Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

177. Indeed, the plea agreement signed by McKinsey's co-conspirator states bluntly: "Purdue, *in collaboration with [McKinsey]*, implemented many of [McKinsey's] recommendations." (emphasis added).

178. Further, Purdue admitted that E2E "*was overseen by [McKinsey]* and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO")." (emphasis added).

## 2. McKinsey's *Mea Culpa*

179. On December 5, 2020, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued in response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:

# McKinsey statement on its past work with Purdue Pharma

*December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

46

180.    As the statement indicates, McKinsey stopped doing opioid-specific work "anywhere in the world." Given that Purdue's operations addressed only the United States, the global reach of McKinsey's regret is noteworthy.

181.    In August of 2013, when the Sacklers adopted McKinsey's "Project Turbocharge" for Purdue, Tim Reiner ("Reiner"), a long-time McKinsey consultant, joined Mundipharma. Mundipharma is a separate company—also owned by the Sacklers—that sells opioids internationally.

182.    Reiner is currently the Sacklers' "Chief Business Officer" at Mundipharma. As late as 2019, Mundipharma has been asserting many of the same misleading claims about opioids that previously led to criminal liability in the United States.[54]

183.    "It's right out of the playbook of Big Tobacco. As the United States takes steps to limit sales here, the company goes abroad," stated former commissioner of the U.S. Food and Drug Administration, David Kessler.

**J.    McKinsey Took Its Purdue Playbook to Other Major Opioid Manufacturers**

184.    In addition to Purdue, McKinsey also worked for Johnson & Johnson, Mallinckrodt, Teva, Actavis, and Endo International/Par Pharmaceuticals. Collectively, these manufacturers constituted most of the opioid market. The Drug Enforcement Agency ("DEA") has published data that just four of McKinsey's clients—Purdue, Endo/Par, Mallinckrodt, and Actavis—accounted for nearly 90% of all opioid pills sold in the United States from 2006 to 2014.

---

[54] See Erika Kinetz, *Fake doctors, pilfered medical records drive OxyChina sales*, Assoc. Press (Nov. 19, 2019), https://apnews.com/article/4122af46fdba42119ae3db30aa13537c.

### 1.    McKinsey and Mallinckrodt

185.    Mallinckrodt was one of McKinsey's leading clients in the opioid industry. The firm worked for the Irish American drug maker during much of the 2010s.

186.    Mallinckrodt primarily sells generic drugs, including oxycodone and hydrocodone, two of the most popular opioids on the market. Mallinckrodt's U.S. headquarters are in St. Louis, and it markets opioids through a subsidiary called SpecGx LLC.

187.    Mallinckrodt is far less known than Purdue Pharma but, at times, it has played an even more significant role in fueling the opioid crisis. For example, between 2006 and 2014, Mallinckrodt produced more opioid pills than any other manufacturer operating in the United States, according to an analysis of DEA records by the Washington Post. The 36 billion pills manufactured by Mallinckrodt during that period accounted for 35.7% of the total market. The DEA described Mallinckrodt as the "kingpin of the drug cartel."

188.    From ARCOS data collected between 2006 and 2014, Mallinckrodt's SpecGx subsidiary shipped over 171,000,000 oxycodone and hydrocodone pills into Philadelphia.

189.    During much of the period that Mallinckrodt was producing and sending hundreds of millions of opioid pills into Philadelphia, McKinsey worked with the Mallinckrodt. Accounting records submitted in connection with opioid litigation show that Mallinckrodt made more than 70 payments, worth more than $30 million, to McKinsey from 2013 to 2017. In 2000, 2001, and 2008, Mallinckrodt made at least five additional payments to McKinsey worth a total of $3 million. Most of those payments went to McKinsey's office in Philadelphia and several others were sent to the firm's offices in Germany.

190.    There is some evidence that McKinsey's consulting work for Mallinckrodt concerned sales of its opioid products. Documents related to McKinsey's February 2021 settlement with state attorneys general indicate that the firm helped Mallinckrodt on its opioid sales. In

addition, the timing of the payments included in the accounting records covers the same period in which McKinsey increased its work for opioid clients.

### 2. McKinsey and Actavis

191.     The McKinsey clients that produced opioids included Actavis Generics, a group of companies originally owned by Allergan plc that were told to Teva Pharmaceuticals, Ltd. in 2018. Actavis Generics specialized in off-brand medicines that like oxycodone and hydrocodone. The New Jersey-based company produced more than 32 billion pills from 2006 to 2014, accounting for 32% of the total national market, according to DEA records. Actavis dramatically increased its opioid production during that period: its output of oxycodone doubled, and its production of hydrocodone increased by 50%.

192.     From ARCOS data, Actavis shipped over 77,000,000 pills into Philadelphia.

193.     In the early 2010s, McKinsey worked on a significant Actavis merger, helping the company increase its share of the generic drug market. Actavis was acquired by Watson Laboratories Inc., another manufacturer of generic drugs, in 2012. Media reports and corporate documents indicate that McKinsey helped Watson negotiate the deal. The firm also helped to oversee Watson's integration with Actavis. Watson hired a McKinsey consultant named Marc Lehnen to manage the integration shortly after the sale. Lehnen reported directly to the chairman of the board. The merged company retained the name Actavis after the transaction was completed.

194.     There are many overlaps in personnel that suggest the scope of McKinsey's relationship with Actavis. In 2010, a partner in McKinsey's pharmaceutical practice named Enrico Vanni became an Actavis director. Chris Coughlin, a former Tyco CFO who became an Actavis board member in 2014, also worked for McKinsey as an advisor.

195.    Over the same period, Actavis worked with Valeant Pharmaceutical on several drugs. McKinsey played a significant role in guiding Valeant's corporate strategy during this period.

### 3.    McKinsey and Teva/Cephalon

196.    McKinsey's involvement in the opioid industry includes its work for Teva Pharmaceuticals, which is the largest manufacturer of generic drugs in the world.

197.    Teva's involvement in the U.S. opioid market stretches back to at least 2004, when its generic version of OxyContin was approved by regulators. Teva provided just under 1% of the opioid pills that were manufactured in the United States from 2006 to 2014. Teva's market share increased significantly following two major acquisitions: its 2011 purchase of Cephalon, the manufacturer of a lollipop containing fentanyl, and its purchase of Actavis, the second-largest U.S. producer of opioids, in 2016.

198.    McKinsey worked for Teva in 2012. The drug maker hired the firm to oversee a management reform known as Project Spring. Industry reports indicate that the reforms undertaken as part of Project Spring included a greater focus on routine corporate acquisitions. McKinsey's pharmaceutical practice has frequently advocated for such regular acquisitions.

199.    McKinsey continued to work for Teva after Project Spring was completed. In 2016, a Teva manager corresponded by email with McKinsey consultants about the drug maker's Medicare payment programs. Those exchanges were included in documents released by the U.S. Attorney's office in Massachusetts, which was investigating Teva for fraud. McKinsey does not appear to have been a target of the Massachusetts investigation, but the correspondence suggests that the firm consulted with Teva about ways to ensure that patients could use Medicare to obtain drugs that it manufactured.

### 4. McKinsey and Endo International/Par Pharmaceutical

200. Another McKinsey client that played a central role in the opioid crisis is Endo International. Endo International plc has two principal places of business: one in Dublin, Ireland and the other in Malvern, Pennsylvania.

201. The opioids manufactured by Endo include Percocet and Opana, as well as oxycodone and morphine. Endo's purchase of Par Pharmaceutical, one of the largest makers of generic opioids, in 2015 gave it a significant role in opioid epidemic. Par made 18 billion opioid pills from 2006 through 2014, accounting for 17.6% of the total market. Only Mallinckrodt and Actavis produced more pills during that period. According to ARCOS data, Par alone sent over 203,500,000 oxycodone and hydrocodone pills into Philadelphia.

202. Endo's best-selling opioid for many years was Opana ER, an extended release painkiller. Following reports that drug users were crushing Opana ER and then snorting or injecting it, in order to get the full effect all at once, rather than over time, Endo released a reformulated version in 2012. While the new version was intended to make such abuse more difficult, some users continued to crush the Endo pills and inject the opioid powder. leading to outbreaks of diseases such as HIV and Hepatitis C among people who had shared needles. In 2017, the FDA asked Endo to pull Opana ER. The agency said it had never before sought to remove an opioid pain medicine from the market because of concerns about abuse. Endo withdrew Opana ER and also said it would voluntarily stop promoting its opioid medications and stop research and development on new opioids.

203. In the $600 million settlement that McKinsey reached with 49 states in February 2021, Endo is listed among McKinsey's opioid clients. McKinsey designed and implemented marketing programs for Endo, "increasing the sale and use of opioids," according to documents filed in the case.

204.     McKinsey veterans have served in the top levels of Endo management. In 2013, the drug maker tapped a former McKinsey principal named Rajiv DeSilva as its new CEO. De Silva had previously been an executive at another pharmaceutical company, Valeant, which often turned to McKinsey for advice on acquisitions. After he joined Endo, De Silva launched a series of acquisitions of his own, apparently relying on a version of the strategy that McKinsey had helped forge at Valeant.

205.     Endo's purchase of DAVA Pharmaceuticals, a generic drug specialist, in 2014 was one of the first deals that De Silva pursued at the drug maker. Court filings in a securities case show that Endo hired McKinsey to provide "the pre-acquisition valuation of the DAVA acquisition." McKinsey's early work on mergers often evolves into a much more expansive role for the firm, including the provision of strategic advice and help with the integration of the merging companies.

206.     In 2015, Endo acquired Par Pharmaceuticals for $8 billion. Before that deal, Endo had been providing less than one half of l % of the supply of opioid pills in the United States. The acquisition of Par made Endo the third largest opioid producer in the country. De Silva's use of McKinsey during his 2014 acquisition as well as the mergers he pursued during his time at Valeant, suggests that he may have again sought assistance from the firm for the Par deal.

207.     Personnel overlaps also suggest that McKinsey may have been involved with Endo's acquisition of Par. At the time of the deal, Par was owned by TPG, a private equity firm with $85 billion in assets. TPG's pharmaceutical and health care team is made up largely of former McKinsey consultants who were closely engaged with Par.

### 5. McKinsey and Johnson & Johnson

208.     McKinsey also worked for Johnson & Johnson, an American pharmaceutical and medical device company headquartered in New Brunswick, New Jersey, in designing aggressive marketing programs to push opioid sales.

209.     In the early 2000s, McKinsey encouraged Johnson & Johnson to target high-risk populations aggressively. In one presentation from 2002, for instance, the firm advised Johnson & Johnson to "[t]arget high abuse-risk patients (e.g., males under 40)." The firm also suggested that Johnson & Johnson reach out to doctors specializing in treating elderly patients with back pain and expanding some of its stronger pain killers beyond use in cancer patients.

### K.     McKinsey Worked for All of the Major Opioid Distributors

210.     McKinsey also worked for the three major drug distributors: McKesson, AmerisourceBergen, and Cardinal Health.

### 1.     McKinsey and McKesson

211.     McKinsey's client roster includes McKesson, the largest distributor of opioids in the U.S. The company, based in Irving, Texas, accounts for one-third of all pharmaceuticals used in North America. McKesson serves more than half of U.S. hospitals and one-fifth of American physicians.

212.     McKesson distributed 19 billion oxycodone and hydrocodone pills between 2006 and 2014, more than any other distributor. The pills provided by McKesson made up 18.9% of the pills shipped in the country during that period. McKesson shipped over 174,000,000 oxycodone pills and 21,300,000 hydrocodone pills into the Philadelphia region, accounting for 39.2% and 17.7% of the market for those products, respectively. During a December 2017 episode of *60 Minutes*, David Schiller, the DEA assistant special agent in charge of the lead field team for the agency's investigation of McKesson, said the company is "at the forefront" of the opioid epidemic.

213.    McKinsey's relationship with McKesson stretches back to at least 2008. That year, the firm prepared a proprietary report for McKesson about the process of authorizing medication requests with insurance companies, a critical issue for the opioid industry. If McKinsey's report resulted in a streamlined approval process for opioid prescriptions, both McKesson and the broader opioid market would have benefited.

214.    McKinsey appears to have consulted for McKesson on a wide range of matters for at least a decade following the 2008 report. In 2013, the firm worked with a McKesson unit based in the United Kingdom that provides the National Health Service with IT services. In a 2017 post on an online message board, a person described as a McKesson employee said the company had brought in McKinsey to assist with a reorganization of the general counsel's office. McKesson's principal legal exposure for several years has been its opioid liability.

215.    Several video and print interviews conducted between 2006 and 2012 by McKinsey Quarterly with McKesson's former CEO, John Hammergren, further indicated a close relationship between the firm and the drug distributor. McKinsey has a long pattern of promoting its clients and their executives in the Quarterly and other company publications. The McKinsey interview with Hammergren suggests that McKesson may have hired the firm as early as 2006, shortly after McKinsey's first known work for Purdue Pharma.

216.    There is additional evidence that McKesson remains an active McKinsey client. A McKesson executive recently participated in a McKinsey leadership program that appears to be exclusively for employees of companies that have retained the consulting firm.

217.    McKinsey promotes programs such as its Black Executive Leadership Program, part of the "McKinsey Academy," as a service the firm provides to its clients. The Black Executive Leadership Program is an offshoot of the firm's Executive Leadership Program, whose participants

"are nominated by their organization's leaders in conjunction with their McKinsey client service team." James Frison, who is both McKesson's senior director for social impact and president of the McKesson Foundation, has been listed as an executive sponsor of McKinsey's Black Executive Leadership Program since December 2020.

218.     Many high-ranking executives have also jumped between McKesson and McKinsey. At least three McKesson employees have left the drug distributor in recent years to join McKinsey. They include Neema Uthappa, who was the global director of automation, AI, and engineering at McKesson from 2017 to 2021. Uthappa was recently named McKinsey's head of data and analytics engineering.

219.     There have also been significant personnel flows in the opposite direction. The roster of current and former McKesson executives includes at least 11 people who worked at McKinsey earlier in their careers. This pattern of McKinsey consultants going on to take senior positions at McKesson dates back to the 1970s.

220.     Many of the former McKinsey employees who moved on to McKesson worked as consultants for the distributor before they became full-time employees at the company. One such example is Marc Owen, who was a member of McKesson's executive committee from 2001 to 2017. Prior to joining McKesson, he was a senior partner at McKinsey with a focus and pharma and health care, with McKesson among his clients. Similarly, McKesson Vice President Ramesh Srinivasan joined the distributor in 2013, after seven years at McKinsey. Nathan Gosse, who occupied a post as vice president in McKesson from 2011 to 2020, also joined immediately from McKinsey, having worked for the consulting firm from 2008 to 2011. Other top McKesson executives who previously worked at McKinsey include Erin Young, the chief marketing and

merchandising officer of McKesson Canada, and Jose Queijo, a senior director of strategy at McKesson since April 2020.

      **2.**      **McKinsey and AmerisourceBergen Drug Corp.**

221.    McKinsey also performed engagements for AmerisourceBergen, the second largest pharmaceutical distributor in the United States. The distributor, based in Chesterbrook, Pennsylvania, accounted for 13.2% of all oxycodone and hydrocodone pills shipped in the United States from 2006 to 2014, more than 13 billion in all. AmerisourceBergen shipped over 64,200,000 oxycodone and hydrocodone pills into the Philadelphia region.

222.    AmerisourceBergen appears to have a longstanding professional relationship with McKinsey. In March 2018, for instance, AmerisourceBergen tapped McKinsey to consult on, among other topics, the distributor's outreach to drug manufacturers.

223.    A filing submitted as part of a lawsuit against the big three distributors by Huntington, West Virginia, and surrounding Cabell County, is indicative of McKinsey's work for AmerisourceBergen. The expert witness report refers to materials AmerisourceBergen provided to McKinsey as part of its engagement, including marketing and promotional literature, price lists for its advertising campaigns, and details of past strategies for targeting patients and providers. Such issues were typical of McKinsey's consulting work for companies in the opioid industry.

224.    Many former McKinsey personnel have decamped for AmerisourceBergen. For instance, Leslie Donato, the distributor's chief strategy officer and executive vice president spent nearly 15 years at McKinsey in the 1990s and 2000s.

225.    AmerisourceBergen's chief information officer, Mark Spykerman, joined the distributor in 2012 after a five-year stint at McKinsey. Sara Fernandez, who headed an AmerisourceBergen consulting division from 2008 to 2018, came to the distributor after two years

at McKinsey. And Eric McCafferty, AmerisourceBergen's recently-named vice president for strategy and corporate development, was a McKinsey consultant from 2001 to 2011.

### 3.    McKinsey and Cardinal Health

226.    McKinsey has long worked for Cardinal Health, the third member of the big three distributors. Headquartered in Dublin, Ohio, Cardinal Health operates the "largest generic sourcing entity in the U.S." in partnership with CVS Caremark. According to DEA data, the distributor was responsible for shipping the second largest quantity of oxycodone and hydrocodone in the country from 2006 to 2014—15 billion pills in total. Cardinal Health was responsible for shipping over 111,000,000 oxycodone and hydrocodone pills into Philadelphia between 2006 and 2014.

227.    At least one Cardinal Health executive recently completed a McKinsey leadership program that the firm offers exclusively to clients, indicating that Cardinal Health is a client. Stephanie Revish, the distributor's vice president for finance transformation, completed McKinsey's Black Executive Leadership Program in January 2021.

228.    Two additional Cardinal Health vice presidents have also completed the same McKinsey program: Angela Thomas, a 26-year veteran of the company, and Rick Bright, who joined Cardinal Health in 2018 after six years at AmerisourceBergen.

229.    Cardinal Health has participated in several McKinsey initiatives in which it typically works with client firms. These include a 2018 study of women in corporate American, titled "Women in the Workplace". In 2009, Karry Clark, who then served as chairman and CEO of Cardinal Health, was among 14 interviewees in a McKinsey Quarterly article about their response to the Great Recession. The executives featured in these articles often work for McKinsey clients.

230.    As with its big three competitors, Cardinal Health has also hired executives from McKinsey on repeated occasions. Nancy Killefer spent 21 years at McKinsey—and reportedly

founded the firm's public—sector practice, which has worked extensively with the FDA before being named to Cardinal Health's board of directors in 2015. Former McKinsey pharma partner Michele Holcomb has been executive vice president and chief strategy and business development officer at Cardinal Health since 2017. Other McKinsey alumni who later moved onto Cardinal Health include Rudy Poussot, who served as vice president for corporate strategy at Cardinal Health between 2010 and 2017, and Nicolette Jang Turner, a director and vice president at Cardinal Health from 2016 to 2020.

### L.     McKinsey Worked for Major Opioids Retailers

231.     McKinsey has performed multiple engagements for two of the largest retail vendors of opioid drugs—CVS and Walmart. The two pharmacy chains have hired McKinsey to deal with a host of different strategic issues, likely including their opioid sales. Other McKinsey clients in the opioid sphere have launched initiatives with CVS and Walmart, a likely sign of McKinsey's coordination.

### 1.     McKinsey and CVS

232.     McKinsey has worked extensively for CVS over the past decade. CVS Pharmacy, Inc. is a Rhode Island business entity with its principal place of business in Rhode Island. CVS Health Corporation (together with CVS Pharmacy, Inc., "CVS") is a Delaware business entity with its principal place of business in Rhode Island.

233.     CVS is authorized to conduct business in Pennsylvania. At all relevant times, CVS has sold and continues to sell prescription opioids at locations in and around Philadelphia, including near hospitals, clinics, and other health care facilities serving Philadelphians.

234. CVS operates nearly l0,000 retail locations across the country and 57 locations in Philadelphia.[55] The chain has been among the country's top sources of opioids, providing 7.7 billion pills, or 7.6% of the market, from 2006 to 2014 nationwide. The chain ranks second only to Walgreens among pharmacy chains in the provision of opioids. In Philadelphia, CVS pharmacies purchased more than 67,000,000 pills of oxycodone and hydrocodone between 2006 and 2014, accounting for over 13% of those pills to be dispensed during that time.

235. CVS has already been sanctioned for its lax oversight of opioids. The company reached a $22 million settlement with the Department of Justice in May 2015 following charges that the chain and its wholesale supplier, Cardinal Health, knew that large orders of oxycodone were being shipped to two of its Florida locations but did nothing to investigate the suspicious sales.

236. According to its most recent annual report, CVS is a defendant in hundreds of opioid-related cases, including cases brought by several state attorneys general. CVS also said that, in January 2020, it was served with an administrative subpoena seeking "documents relating to practices with respect to opioids ...."

237. CVS is reportedly among McKinsey's biggest clients. CVS is listed among the users of Periscope, a platform built by McKinsey that provides retailers with data and analytics tools. CVS is also mentioned regularly in McKinsey publications, which often indicates an ongoing client relationship.

238. There are several indications that a McKinsey managing partner named Rodney Zemmel was among the firm's executives who worked with CVS. Zemmel co-authored a 2018 book, *Go Long: Why Long-Term Thinking is Your Best Short-Term Strategy*. The book praised

---

[55] https://www.cvs.com/store-locator/cvs-pharmacy-locations/Pennsylvania/Philadelphia.

former CVS CEO Larry Merlo, pointing to him as an example of a CEO who adopted a long-term strategic approach.

239. At one point, McKinsey's advice to Purdue Pharma on how it could increase OxyContin sales involved offering CVS (among other pharmacies) a cash rebate for every overdose that was attributed to pills they sold. According to documents made public as part of litigation against Purdue, a 2017 McKinsey presentation included a slide depicting calculation of how many CVS customers would overdose in a year and the resulting revenue to CVS under the rebate plan. The slide illustrated that, if 2,484 CVS customers overdosed on the drug in 2019 or developed an opioid use disorder, and Purdue paid CVS $14,810 for each of those so-called "events", then Purdue would pay the retailer $36.8 million that year.

240. CVS took its own steps to boost opioid sales. The retailer sent letters to patients taking Opana, an opioid made by Endo—another McKinsey client—encouraging them to continue taking the drug. CVS also promoted opioids made by Actavis, yet another McKinsey client, using rebates and discounts to encourage sales of the drugs. CVS also worked with Purdue, another McKinsey client, to train the drug maker's pharmacists to reassure patients and doctors who had concerns about the risks of OxyContin addiction and abuse.

241. CVS is also part of a joint venture with Cardinal, another McKinsey client, that established Red Oak Sourcing, which is now one of the largest buyers of generic drugs in the country. Under the 2014 arrangement, Cardinal—one of the top opioid distributors—made quarterly payments to CVS of $25.6 million, with additional payments if certain benchmarks were met. This partnership created a direct financial tie between Cardinal and CVS.

242.    One of the top executives at Red Oak, Sumit Jain, previously worked at McKinsey. Jain, Red Oak's director of prescription sourcing, worked with pharmaceutical clients while at the consultancy in the early 2000s, joining CVS Health in 2004.

### 2.    McKinsey and Walmart

243.    Wal-Mart Stores, Inc. ("Walmart") is a Delaware business entity with its principal place of business in Arkansas. At all relevant times, Walmart has distributed substantial amounts of prescription opioids in the Commonwealth.

244.    With more than 5,000 pharmacies in the United States, Walmart has played an enormous role in driving the opioid crisis. It sold more than 7 billion opioid pills from 2006 to 2014, behind only Walgreens and CVS.

245.    Through just five pharmacies, Walmart purchased more than 3.3 million dosage units of oxycodone and hydrocodone from 2006 to 2014, the years for which ARCOS data is available. One Walmart store located at 9745 Roosevelt Blvd A, Philadelphia, purchased over 1.2 million dosage units of oxycodone and hydrocodone during that time while another, located at 4301 Byberry Rd, Unit A, Philadelphia, purchased over a million.

246.    Walmart pharmacies in various states took actions that exacerbated the epidemic. It built incentive programs around the number of prescriptions filled by each pharmacy, which discouraged pharmacists from scrutinizing prescriptions with red flags.

247.    Consequently, as demonstrated in extensive litigation stemming from Walmart's role in the crisis, Walmart employees regularly filled prescriptions that were more frequent and larger than a typical painkiller recipient would need. The chain also made a practice of filling opioid prescriptions for out-of-town customers, often combined with other drugs that were abused in tandem with opioids.

248.     McKinsey has worked for Walmart since at least 2004, when the consulting firm compiled a report about how negative press affected consumers' willingness to shop at Walmart. Two years later, McKinsey consulted on Walmart's health care programs. In 2007, McKinsey advised Walmart on the composition of its workforce and its reliance on an aged employee base.

249.     McKinsey's publications have frequently highlighted Walmart's executives and initiatives, a practice that typically involves the firm's clients. For instance, a pair of 2019 reports on retail practices discussed Walmart extensively. And, in September 2018, McKinsey's website published an interview Kathleen McLaughlin, the retailer's chief sustainability officer. These repeated promotions of Walmart in McKinsey publications suggest that the client relationship began in the mid-2000s, if not sooner, and has persisted until very recently.

250.     At least two top figures at Walmart also have professional ties to McKinsey. McLaughlin, the chief sustainability officer mentioned above, spent 23 years at McKinsey prior to joining the retail giant. Walmart board member Timothy Flynn is also on the board of MIO Partners, McKinsey's internal hedge fund.

### M.     McKinsey Worked with Several Investment Funds, Including its Own Hedge Fund, with Extensive Investment in the Opioid Industry

251.     McKinsey and its internal hedge fund, MIO Partners, also have extensive ties to TPG Group and Deerfield Management, which have held significant stakes in leading opioid manufacturers like Par Pharmaceutical and addiction treatment facilities like American Addiction Centers. Both TPG and Deerfield have longstanding connections to McKinsey and MIO Partners. Deerfield manages more than $100 million on behalf of MIO and has been one of the firm's top managers for close to a decade. A TPG executive who previously worked at McKinsey was recently named a trustee of an MIO sub-unit that controls close to $8 billion and TPG is reportedly

a client of McKinsey. As is the case for many McKinsey clients, many McKinsey employees worked for TPG or Deerfield before or after they worked at McKinsey.

252.    SEC filings list more than 60 funds that serve as MIO's third-party managers. Through this group, MIO has held stakes in virtually every key opioid manufacturer that is publicly traded. At least one of these funds was executing trades at the explicit instruction of MIO, according to government filings. This pattern of trading meant that the personal financial interests of McKinsey consultants were aligned with those of opioid manufacturers, distributors, and pharmacies. In sum, McKinsey profited from every aspect of the opioid crisis that it helped create and maintain, including through consulting fees, government contracts, and investments in every business category, from manufacturing, distribution, and addiction rehabilitation centers.

### N.    The Impact of McKinsey's Conduct

253.    McKinsey used its world class expertise to create and execute aggressive marketing schemes for various opioids manufacturers as well as distributors and retailers in the opioids industry. These marketing schemes proved to be wildly successful for McKinsey's clients but devastated the lives of hundreds of thousands, including those in the Philadelphia Community.

254.    The deceptive marketing strategies McKinsey developed and helped to implement worked, as described above.  Deceptive marketing, including marketing McKinsey worked to develop and implement, substantially contributed to an explosion in the use of opioids across the country, including in the Commonwealth and in the City of Philadelphia.

255.    In the early days of the opioid crisis, McKinsey pushed an aggressive and strikingly similar sales strategy for several of its opioid manufacturer clients. This strategy, which McKinsey personnel have referred to as "turbocharging" opioid sales, pushed McKinsey clients to seek out vulnerable patient populations and create incentives for doctors who prescribed to them.

256.    Such strategies meant that the success of McKinsey clients was purposefully linked to greater rates of addiction.

257.    Another example is McKinsey's suggested tactic of "patient pushback", where McKinsey and manufacturers encouraged patients to lobby their doctors for opioids when those physicians expressed reservations regarding the administration of opioids.

258.    The key prong of McKinsey's advice, however, was to identify historically large prescribers and target ever more sales and marketing resources on them. For example, McKinsey devised a "physician segmentation" initiative whereby it analyzed the opioid prescribing patterns of individual physicians to identify those who had historically been the highest volume prescribers. McKinsey identified these physicians as optimal targets for a massive marketing push to sell more opioid products.

259.    The opioid epidemic has escalated with devastating effects. McKinsey's and opioid manufacturers' actions related to opioids has caused substantial opiate-related substance abuse, hospitalization, and death in Philadelphia.

260.    As a result of the impacts described above, and others, Plaintiff has incurred substantial expense to address the opioid epidemic that McKinsey's misconduct was a substantial factor in creating.

261.    These impacts include, inter alia:

a.    Costs for treating Opioid Use Disorder (OUD), co-occurring Substance Use Disorder or Mental Health conditions (SUD/MH) and patients suffering from overdoses.  This includes healthcare and medical care, Medication-Assisted Treatment and other withdrawal management services as well as counseling, psychiatric and other mental health care support, case management, and other therapeutic treatment and recovery support services;

b.      Costs associated with providing additional services to individuals with OUD and related SUD/MH conditions, including housing, transportation, education, job placement, job training and/or childcare;

c.      Costs for other social services to victims of the opioid epidemic and their families;

d.      Costs related to screening for OUD and other risk factors and programs to reduce the transition from use to disorders;

e.      Costs associated with addressing the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system, and links to treatment and related services.

f.      Costs for providing treatment, recovery support, harm reduction and other services to individuals with OUD and related SUD/MH conditions who are incarcerated.

g.      Other costs associated with opioid-related crime.

h.      Costs associated with addressing the needs, including treatment, recovery services and prevention for pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, the needs of their families, including treating babies with neonatal abstinence syndrome (NAS);

i.      Costs related to with providing treatment of infants born with NAS or other opioid-related medical conditions, or born dependent on opioids due to drug use by their mothers during pregnancy, including educating and supporting families affected by NAS and long-term monitoring and care for these children;

j.      Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation, including supportive housing and other residential services

relating to children being removed from the home and/or placed in foster care due to custodial opioid use;

k.     Costs related to efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing through education and training;

l.     Costs associated with efforts to discourage or prevent misuse of opioids including through public education campaigns and other prevention initiatives;

m.     Costs of training first responders in the proper treatment of drug overdoses; including costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose, and other costs associated with emergency responses by first responders to opioid overdoses;

n.     Costs for drug disposal and take back programs and programs to provide naloxone and/or other drugs that treat overdoses to overdose patients, individuals with OUD and their friends, family members and others in the community who may come into contact with individuals who are overdosing.

## V. FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT: THE OPIOID MARKETING ENTERPRISE

### A.     The Common Purpose and Scheme of the Opioid Marketing Enterprise

262.     Knowing that these products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, McKinsey, which participated in the marketing and sale of opioids as described in this complaint, and Manufacturers[56],

---

[56] "Manufacturers" include Purdue, Mallinckrodt, Johnson & Johnson/Janssen, Endo/Par, Actavis, and Teva/Cephalon.

Distributors[57], and Retailers[58] of opioids, (collectively, including McKinsey, the "Opioid Marketing Enterprise Members") formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

263.    In order to unlawfully increase the demand for opioids, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise"). Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose. The Opioid Marketing Enterprise Members' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging, fueled the opioid epidemic in Philadelphia.

264.    The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiff, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks

---

[57] "Distributors" include McKesson, AmerisourceBergen, and Cardinal Health.

[58] "Retailers" include CVS and Walmart.

of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; (9) that abuse-deterrent formulations provide a solution to opioid abuse; and (10) that opioids would bring patients freedom and peace of mind.

265.    The scheme devised, implemented, and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Marketing Enterprise Members' drugs. The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

266.    There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

267.    As public scrutiny and media coverage focused on how opioids ravaged communities throughout the United States, McKinsey did not challenge any Manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

268.    The Opioid Marketing Enterprise Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise. The Opioid

Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing Enterprise involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain.

269.   The impact of the Opioid Marketing Enterprise's scheme is still in place—i.e., opioids continue to be prescribed and used for chronic pain throughout the Philadelphia Community, and the epidemic continues to injure Philadelphia and its citizens and consume Philadelphia's resources.

270.   As a result, it is clear that the Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

## B.   The Conduct of the Opioid Marketing Enterprise Violated Civil RICO

271.   From at least 2004 to the present, each of the Opioid Marketing Enterprise Members exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a.   Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b.   Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c. Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

d. Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints;

e. Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

f. Using front groups and key opinion leaders ("KOLs") to mislead the public about opioids and taint sources that doctors and patients relied on for ostensibly "neutral" independent medical guidance, such as treatment guidelines, continuing medical education ("CME") programs, medical conferences and seminars, and scientific articles.

272. The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to increase the Opioid Marketing Enterprise Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to present day.

## C. Pattern of Racketeering Activity

273. The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

274. The pattern of racketeering activity used by the Opioid Marketing Enterprise Members and the Opioid Marketing Enterprise likely involved thousands of separate instances of

the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales of the Opioid Marketing Enterprise Members' drugs induced by consumers, prescribers, regulators and Plaintiff's reliance on the Opioid Marketing Enterprise Members' misrepresentations.

275.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud the City of Philadelphia, and other intended victims.

276.    The Opioid Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute and non-cancer pain. The Opioid Marketing Enterprise Members knew that these representations violated the FDA approved use these drugs and were not supported by actual evidence. The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

277.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, to prescribers, regulators and the public, including Plaintiff, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

278.    The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

a.    Marketing materials about opioids, and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, published, and transmitted to front groups and KOLs located across the country, including in Plaintiff's Community;

b.    Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and front groups, regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

c.    Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

d.    E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the front groups agreeing to or implementing the opioids marketing scheme;

e.    E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the KOLs agreeing to or implementing the opioids marketing scheme;

f.    Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, front groups and the media regarding publication,

drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

g.      Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

h.      Written and oral communications directed to The City of Philadelphia and community that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

i.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

279.   In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Opioid Marketing Enterprise Members that the front groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities, and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

280.   To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators and the City: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members and by their KOLs, front groups and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

281.    The Opioid Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

282.    Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that opioid manufacturers among the Opioid Marketing Enterprise Members financed, supported, and worked through the same KOLs and front groups, and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

283.    The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff's business and property, while simultaneously generating billion-dollar revenue and profits for the Opioid Marketing Enterprise Members. The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## VI. TOLLING OF STATUTES OF LIMITATIONS

284.    Because the City of Philadelphia's claims accrue to the City in its governmental capacity and the City brings this action to enforce a public right, the statute of limitations does not apply to any of the City's claims.  *See Commonwealth v. RBC Cap. Markets Corp*., 264 A.3d 825 (Pa. Commw. Ct. 2021), quoting *City of Philadelphia v. Lead Industries Association, Inc.,* 994 F.2d 112, 118-119 (3d Cir. 1993).  However, in the event the statute of limitations is deemed to apply, it has been tolled for the reasons set forth below.

74

**A.     Equitable Estoppel and Fraudulent Concealment**

285.    McKinsey is equitably estopped from relying upon a statute of limitations defense because, alongside Purdue and each of the Manufacturers, Distributors and Pharmacies, McKinsey undertook active efforts to deceive Plaintiff and to purposefully conceal their unlawful conduct and fraudulently assure the public and Plaintiff that the Opioid Marketing Enterprise was undertaking efforts to comply with its obligations under the state and federal controlled substances laws, all with the goal of protecting its registered manufacturer or distributor status in the Commonwealth and to continue generating profits for McKinsey and Opioid Marketing Enterprise. Notwithstanding the allegations set forth above, McKinsey affirmatively assured the public and the City of Philadelphia that it was working to curb the opioid epidemic.

286.    McKinsey and the Opioid Marketing Enterprise were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

287.    McKinsey's consulting services were given confidentially, and McKinsey, and its clients, concealed the content of those services from the public.

288.    McKinsey and the Opioid Marketing Enterprise also concealed from Plaintiff the existence of Plaintiff's claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that Manufacturers', Distributors', and Pharmacies' legal duties to stop its deceptive marketing and report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens. These repeated misrepresentations misled regulators, prescribers and the public, including the City of

Philadelphia, and deprived the City of actual or implied knowledge of facts sufficient to put the City on notice of potential claims.

289.   Plaintiff did not discover the nature, scope and magnitude of McKinsey's misconduct and its full impact on the City of Philadelphia, and the City could not have acquired such knowledge earlier through the exercise of reasonable diligence.

290.   McKinsey's campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing into Philadelphia deceived the medical community, consumers, and the City.

291.   Further, opioid Manufacturers also concealed and prevented discovery of information, including data from the ARCOS database.

292.   McKinsey intended that their actions and omissions made with Purdue and the Opioid Marketing Enterprise would be relied upon, including by the City. The City of Philadelphia did not know and did not have the means to know the truth, due to McKinsey and Opioid Marketing Enterprise's actions and omissions.

293.   Plaintiff reasonably relied on McKinsey and Opioid Marketing Enterprise's affirmative statements regarding their purported compliance with their obligations under the law and applicable consent orders.

## B.   McKinsey and Purdue Persisted in a Fraudulent Scheme Despite a Guilty Plea and Large Fine

294.   In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction. Purdue was ordered to pay $600 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science. Additionally, Michael Friedman, the

company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines;

Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and

Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million

in fines.

295.    Nevertheless, even after the settlement, Purdue continued to pay doctors on

speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund

seemingly neutral organizations to disseminate the message that opioids were non-addictive as

well as other misrepresentations. At least until early 2018, Purdue continued to deceptively market

the benefits of opioids for chronic pain while diminishing the associated dangers of addiction.

After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative

actions that might encroach on its business. Between 2006 and 2015, Purdue and other painkiller

producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying

and political contributions—eight times what the gun lobby spent during that period. McKinsey

participated extensively in these actions and provided Purdue with strategies and assistance to

maximize sales as described in this complaint.

296.    As all of the government actions against Purdue and McKinsey demonstrate,

McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded

in order to increase Purdue's sales and profits, and in turn to serve McKinsey's financial interests.

297.    In addition, McKinsey's consulting services were given confidentially, and the

content of those services was not public.  Plaintiff did not have knowledge of the scope, magnitude,

and unlawful nature of McKinsey's conduct until 2020, when documents produced in the Purdue

bankruptcy proceedings revealed details regarding McKinsey's role in advising Purdue and

working with Purdue to implement the unlawful conduct detailed in this complaint.  Information

in the public domain was insufficient to place Plaintiff on notice of McKinsey's unlawful conduct, prior to 2020.  For these reasons, any statutes of limitations applicable to Plaintiff's claims did not begin to run and have been tolled until 2020.

298.    In addition, McKinsey is estopped from relying on any statute of limitations defense because its unlawful practices as alleged herein, which were continuing in nature, have created continuing and repeated injuries to Plaintiff and Plaintiff's Community.

## VII.  CAUSES OF ACTION

### Count I: Racketeer Influenced and Corrupt Organizations (RICO)
### 18 U.S.C. § 1961, et. seq.

299.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

300.    This claim is brought by Plaintiff against Defendant McKinsey for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

301.    At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

302.    Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as it was and is injured in its business and/or property as a result of Defendant's wrongful conduct described herein.

303.    The Opioid Marketing Enterprise conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain. Through the racketeering activities of

78

the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use. In so doing, each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

304.    The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

305.    Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

306.    Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

307.    Further, each of the Opioid Marketing Enterprise Members had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The

systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Opioid Marketing Enterprise Members, including McKinsey working with and through the other Opioid Marketing Enterprise Members, coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

308.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each Opioid Marketing Enterprise Member and its members; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each Member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the Enterprise to pursue its purpose and functioned as a continuing unit.

309.    The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public

perceptions in order to increase the prescription and use of prescription opioids, and expand the market for opioids.

310.    The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail and interstate wire facilities. The Opioid Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones and the internet to transmit mailings and wires in interstate or foreign commerce.

311.    The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.    Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

b.    Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire

for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

312.    Indeed, as summarized herein, the Opioid Marketing Enterprise Members used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions and payments to carry-out the Opioid Marketing Enterprise's fraudulent scheme.

313.    Because the Opioid Marketing Enterprise Members disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members, front groups, and KOLs. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy. However, Plaintiff has described the occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, and the City of Philadelphia, and how those acts were in furtherance of the scheme.

314.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators and Plaintiff. The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood

and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

315.    The Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

316.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators and the Plaintiff. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators and the Plaintiff. The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

317.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

318.    As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

319.     The Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic. Plaintiff's injuries were not unexpected, unforeseen or independent. Rather, as Plaintiff alleges, the Opioid Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

320.     It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

321.     McKinsey's misleading marketing and failure to prevent prescription opioid diversion damaged Plaintiff and Plaintiff's Community. McKinsey's misconduct has contributed to a range of social problems, including addiction, violence and delinquency. Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair. As a result, more and more of Plaintiff's resources are devoted to addiction-related problems.

322.     Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiff in the form of substantial losses of money

and property that logically, directly, and foreseeably arise from the opioid-addiction epidemic. Plaintiff's injuries, as alleged in this complaint, and expressly incorporated herein by reference, include, inter alia:

a.      Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

b.      Costs of training first responders in the proper treatment of drug overdoses;

c.      Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

d.      Costs associated with emergency responses by first responders to opioid overdoses;

e.      Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

f.      Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

g.      Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

h.      Costs associated with opioid-related crime.

323.    Plaintiff's injuries were directly and thus proximately caused by these racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiff's injuries. But for the opioid-addiction epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiff would need to spend resources on addressing the impacts of the opioid epidemic as described herein.

324.     Plaintiff is the most directly harmed entity and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

325.     Plaintiff seeks all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorneys' fees; all costs and expenses of suit; and pre- and post-judgment interest, including, inter alia:

a.     Actual damages and treble damages, including pre-suit and post-judgment interest;

b.     An order enjoining any further violations of RICO;

c.     An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

d.     An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

e.     An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

f.     An order enjoining any future marketing of opioids through non-branded marketing including through front groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

g.     An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

h.     An order requiring McKinsey to publicly disclose all documents, communications, records, data, information, research or studies related to its work with Purdue and other manufacturers of opioids;

i.       An order divesting McKinsey of any interest in, and the proceeds of any work related to opioids;

j.       Forfeiture as deemed appropriate by the Court; and

k.       Attorneys' fees and all costs and expenses of suit.

### Count II: Public Nuisance

326.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

327.    McKinsey, through its work with Purdue and other opioid industry participants, has created and continues to perpetuate and maintain a public nuisance under statutory and/or the common law through the massive marketing and distribution of millions of doses of highly addictive, commonly abused prescription pain killers known as opioids.

328.    The action is brought by Plaintiff to abate the public nuisance created by McKinsey through its work with Purdue and other opioid manufacturers, distributors, and retailers.

329.    McKinsey is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injury.  *See* Restatement Second, Torts § 821B. *See Machipongo Land & Coal Co. v. Com.*, 799 A.2d 751, 773 (Pa. 2002); *Muehlieb v. City of Philadelphia*, 574 A.2d 1208 (Pa. Commw. Ct. 1990).

330.    McKinsey has created and/or assisted in the creation of a condition that significantly interferes with public health and public safety. McKinsey's conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a significant effect upon the public right.

331.    McKinsey's unlawful conduct, including its misrepresentations and omissions regarding opioids, generally, and opioids manufactured, distributed, and sold through the Opioid

Marketing Enterprise, specifically, have fueled an opioid epidemic within The City of Philadelphia that constitutes a public nuisance. McKinsey and its clients knowingly exacerbated a condition that affects entire municipalities, counties, towns, and communities.

332.    The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

333.    McKinsey knew and should have known that its clients' promotion of opioids was false and misleading, and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

334.    McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

335.    McKinsey has breached its duties to Plaintiff by disseminating false and misleading information through Purdue regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less-or non-addictive pain killers.

336.    Working through Purdue and other opioid manufacturers, distributors and retailers, McKinsey unlawfully provided false or misleading material information about prescription opioids

or unlawfully failed to use reasonable care orcomply with statutory requirements in the marketing and distribution of prescription opioids.

337.    McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of members of The City of Philadelphia and interfered with the comfortable enjoyment of life and property of others.

338.    Plaintiff did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

339.    McKinsey's acts and omissions affect the entire community of the Plaintiff.

340.    McKinsey's acts and omissions threatened and directly harmed the health and welfare of the City of Philadelphia.

341.    But for McKinsey's actions, opioid use—and, ultimately, misuse and abuse— would not be as widespread as it is today, and the opioid epidemic that currently exists would have been averted.

342.    McKinsey's conduct, including its misrepresentations and omissions regarding opioids, generally, and Purdue's opioids, specifically, constitutes unlawful acts and/or omissions of duties, that annoy, injure, or endanger the comfort, repose, health, and/or safety of others.

343.    Logic, common sense, justice, policy and precedent indicate McKinsey's conduct has caused the damage and harm complained of herein.  McKinsey knew or reasonably should have known that, in devising and assisting opioid Manufacturers with implementing sales and marketing campaigns, including Purdue's Project Turbocharge, that it would dramatically increase the amount of opioids prescribed and distributed in the Commonwealth and in the City of Philadelphia, and it would endanger the health and safety of residents of the Philadelphia.  Thus,

the public nuisance caused by McKinsey in the City of Philadelphia was reasonably foreseeable, including the financial and economic losses incurred by the City of Philadelphia.

344.    As a direct and proximate result of McKinsey's wrongful conduct as set forth herein, McKinsey negligently, intentionally and/or unreasonably interfered with the rights of Plaintiff and Plaintiff's Community to be free from unwarranted injuries, addictions, diseases, sicknesses, overdoses, and criminal actions, and have caused ongoing damage, harm and inconvenience to Plaintiff and Plaintiff's Community, who have been exposed to the risk of addiction to prescription drugs, who have become addicted, and/or have suffered other adverse consequences from the use of addictive prescription drugs, and have been adversely affected by the addiction and abuse of others in the community from these highly additive prescription pain medications.

345.    McKinsey also has a duty to abate the public nuisance caused by the prescription opioid epidemic.

346.    The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

347.    McKinsey has failed to abate the nuisance it created.

348.    Plaintiff seeks an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

349.    Plaintiff seeks damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

350.    As a direct result of McKinsey's conduct, Plaintiff and Plaintiff's Community have suffered actual injury and economic damages including, but not limited to, significant expensesfor

police, emergency, health, education and training, prosecution, child protection, corrections, judicial and other services.

351.    McKinsey is liable to Plaintiff for the costs borne by Plaintiff as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

## Count III: Civil Conspiracy

352.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

353.    McKinsey and Purdue, working together for decades, agreed to commit numerous unlawful acts relating to the sales and marketing of Purdue's opioid products. McKinsey and Purdue also agreed to use unlawful means to commit lawful acts as part of these sales and marketing efforts.

354.    Purdue, other manufacturers of opioids, and McKinsey collectively engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this complaint. Their aggressive marketing campaign enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide, in the State and in the City of Philadelphia.

355.    Without Purdue, other manufacturers of opioids, and McKinsey's misrepresentations, which created demand, the Opioid Marketing Enterprise would not have been able to sell the increasing quantity of prescription opioids for non-medical or inappropriate purposes.

356.     None of the opioid manufacturers or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the Opioid Marketing Enterprise Members.

357.     Purdue, other Opioid Marketing Enterprise Members, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. Purdue, other manufacturers of opioids, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating Federal and state laws, and turning a blind eye to diversion of prescription opioids.

358.     McKinsey and Purdue deployed the unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of HHS for the five years Purdue was subject to a Corporate Integrity Agreement after it pled guilty in 2007 to criminal misbranding. McKinsey assisted Purdue with evading these compliance obligations to accomplish the lawful act of maximizing OxyContin revenue to Purdue.

359.     McKinsey, a majority of the Purdue board of directors, and Purdue agreed to deploy unlawful sales and marketing tactics to achieve the lawful purpose of maximizing revenue of a closely-held company.

360.     As a result of the concerted action between the Purdue, the Opioid Marketing Enterprise Members, and McKinsey, Plaintiff and Plaintiff's Community have suffered damages.

361.     Purdue, other manufacturers of opioids, and McKinsey are jointly and severally liable for the results of their concerted efforts.

## Count IV:  Violation of Pennsylvania Unfair Trade Practices and
## Consumer Protection Law, 73 P.S. §§ 201-1 to 201-9.3

362.    Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

363.    This Count does not sound in fraud.

364.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits companies from employing "[u]nfair methods of competition" and "unfair or deceptive acts or practices," which are defined to include, inter alia, the following conduct:

a.    "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." 73 P.S. § 201-2(4)(ii);

b.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ."  73 P.S. § 201-2 (4)(v); or

c.    "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 P.S. § 201-2 (4)(xxi).

365.    McKinsey is a person under the UTPCPL.

366.    McKinsey violated the UTPCPL in that its conduct as alleged herein caused a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of the drugs at issue.

367.    McKinsey violated the UTPCPL in that by its conduct as alleged herein it represented that the drugs at issue had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have.

368.    McKinsey violated the UTPCPL in that by its conduct as alleged herein it engaged in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

369.     Under Pennsylvania law, an act or practice is unfair or deceptive if it had the capacity to deceive, or was likely to deceive, a substantial portion of the public, and was likely to make a difference in the purchasing decision.

370.     McKinsey's conduct as alleged herein constitutes unfair or deceptive acts or practices in violation of the above provisions of the UTPCPL in that:

a.       At all relevant times, McKinsey and the Opioid Marketing Enterprise Members directly or indirectly made and disseminated, or caused to be made and disseminated, materially false and misleading statements directed at the Opioid Marketing Enterprise Members' target audiences, which included the PBM responsible for selecting the drugs covered by the City's health coverage plans and included on the City's pharmacy formularies;

b.       These false and misleading statements by McKinsey and Opioid Marketing Enterprise were specifically intended to promote the sale and use of opioids to treat chronic pain to members of their target audiences;

c.       At all relevant times, McKinsey directly or indirectly made statements that omitted material facts to promote the sale and use of opioids to treat chronic pain;

d.       McKinsey directly or indirectly repeatedly failed to disclose or minimized material facts about the risks of opioids, including the life-threatening risks of abuse, misuse, and addiction, and their risks compared to alternative treatments.  These omissions were directed at and affected Plaintiff's Community;

e.       Such material omissions by McKinsey were deceptive and misleading in their own right, and further rendered even otherwise truthful statements about opioids misleading, creating a false impression of the risks, benefits, and superiority of opioids for treatment of chronic pain;

94

f.      At all relevant times, McKinsey, directly or indirectly, made and disseminated the foregoing misleading and deceptive statements and omissions through an array of marketing channels including, but not limited to: in-person and other forms of detailing; speaker events, including meals, conferences, and teleconferences; CMEs; journal articles and studies; advertisements; and brochures and other patient education materials;

g.      These materially false and misleading statements and omissions by McKinsey were widely disseminated to the purchasing public, including Plaintiff's Community;

h.      McKinsey knew or should have known that its marketing and promotional efforts created a misleading impression of the risks, benefits and purported superiority of opioids;

i.      McKinsey's conduct, including their deceptive representations and concealments of material fact, created a significant likelihood of confusion and/or misunderstanding as to the safety, efficacy, and risks of opioids, including the risks associated with the use of opioids for chronic pain;

j.      McKinsey's conduct had a tendency to deceive a substantial segment of the Philadelphia Community, and its misrepresentations and concealments of material facts were likely to be misinterpreted in a misleading way; and

k.      McKinsey's acts and practices—taken individually and collectively along with the Opioid Marketing Enterprise Members—were likely to make a difference in the prescribing decisions of doctors; usage and purchasing decisions of patients; the formulary decisions of PBMs; and the payment decisions of end-payors like the City, because their misrepresentations and other wrongful acts were specifically designed to mislead and convince these individuals and groups that opioids were safe and superior to alternative treatments for chronic pain and that Opioid

95

Marketing Enterprise Members were complying with their legal duties to prevent diversion and working with law enforcement to prevent diversion.

371.     As a direct result of the foregoing acts and practices, McKinsey has received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in violations of the UTPCPL as alleged herein.

372.     As direct result of the foregoing acts and practices in violation of the UTPCPL, McKinsey has caused the City and its affected residents and other persons in interest to incur, and continue to incur, enormous costs and expenses related to the purchase of opioids and the consequences of dealing with the opioid epidemic.

373.     The City was injured in that McKinsey's and its clients' branded and unbranded marketing of opioids for chronic pain led to doctors prescribing, patients using, the City's PBMs approving, and the City paying or reimbursing for unnecessary long-term opioid treatment with Defendants' opioids.

374.     The City operates as a consumer when it purchases goods or services, which it does when it pays for the procurement of and/or reimbursement for prescription opioids.

375.     The City, including via its PBMs acting as the City's agents, was subjected to McKinsey's and its clients' improper marketing as alleged above, including materially false representations and omissions about the purported safety and efficacy of opioids.  The City, including via its PBMs, justifiably relied upon these misrepresentations and omissions in determining that opioids should be listed on the City's approved drug formulary, resulting in the City paying or reimbursing for prescriptions of Opioid Marketing Enterprise's opioids.

376.     The City was injured in that the McKinsey's and its clients' deceptive and misleading statements regarding the effectiveness of their diversion monitoring systems in

96

identifying, blocking, and reporting suspicious orders and preventing diversion of prescription opioids led to the City believing that opioid distributors' distribution services and methods for preventing diversion were safe and effective when they were not.

377.    But for McKinsey's deceptive conduct in violation of the UTPCPL, the City would not have expended millions of dollars in connection with the purchase or reimbursement of prescription opioids or the treatment for opioid addiction, opioid use disorder, or any other opioid-related adverse health effect involving the opioid epidemic.  As a direct and proximate result of McKinsey's deceptive conduct, the City has been injured.

378.    Philadelphia has suffered economic injuries that are direct, ascertainable, and quantifiable.  The City's damages constitute both an "ascertainable loss of money or property" and "actual damages" for purposes of 73 P.S. § 201-9.2(a).

379.    The Court "may, in its discretion, award up to three times the actual damages sustained." 73 P.S. § 201-9.2(a).

380.    The City is entitled to treble damages in light of the severe, willful, and long-running nature of McKinsey's conduct, the opioid epidemic it caused, and the resulting harm to public health and safety.

381.    The City is also entitled to an award of its litigation costs and attorneys' fees pursuant to 73 P.S. § 201-9.2(a).

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

a.    Enter judgment against McKinsey and in favor of the City of Philadelphia;

b.    Award compensatory damages in an amount sufficient to compensate Plaintiff fairly and completely for all damages, treble damages, pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

97

c.      Award damages caused by the opioid epidemic, including but not limited to (1) costs for providing medical care and treatment, additional therapeutic and prescription drug purchases including costs of obtaining naloxone and suboxone, as well as other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment of infants born with opioid-related medical conditions, including NAS; (3) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; (4) costs associated with social services, criminal justice and rehabilitation relating to the opioid epidemic; and (5) costs for providing transitional housing for those returning to the community;

d.      Treble damages;

e.      Judgment against McKinsey for restitution, disgorgement of ill-gotten gains, and any other relief allowed in law or equity;

f.      Enter orders and procedures to abate the nuisance created by McKinsey's wrongful conduct;

g.      Enjoin McKinsey from continuing or repeating violations under the UTPCPL, including the wrongful conduct alleged herein and from the publication and/or dissemination of false and misleading materials directly or indirectly;

h.      Award Plaintiff its costs of suit (including expert fees) and reasonable attorneys' fees, as provided by law;

i.      Prejudgment interest;

j.      Damages to the fullest extent available by law in excess of $50,000, exclusive of interest and costs;

k.      Award such further and additional relief as the Court may deem just and proper under the circumstances; and

l.      Grant Plaintiff the right to amend its pleadings to conform to the evidence produced at trial.

DATED: October 7, 2022                         Respectfully submitted,

Diana Cortes, City Solicitor
(PA Bar No. 204274)
Renee Garcia, Head of Litigation
(PA Bar No. 315622)
Benjamin H. Field, Deputy City Solicitor
(PA Bar No. 204569)
**CITY OF PHILADELPHIA LAW DEPT.**
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
Tel: (215) 683-5000
diana.cortes@phila.gov
renee.garcia@phila.gov
benjamin.field@phila.gov

Russell W. Budd^
Christine C. Mansour^
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave, Suite 1100
Dallas, TX 75219
Tel.: (214) 521-3605
rbudd@baronbudd.com
cmansour@baronbudd.com

Burton LeBlanc^
**BARON & BUDD, P.C.**
2600 Citiplace Drive
Baton Rouge, LA 70808
Tel.: (225) 927-5441
bleblanc@baronbudd.com

Jennifer F. Connolly^
Stanford B. Ponson (PA Bar No. 322548)
**BARON & BUDD, P.C.**

_____
Jerry R. DeSiderato (PA Bar No. 201097)
Timothy J. Ford (PA Bar No. 325290)
Silvio Trentalange (PA Bar No. 320606)
**DILWORTH PAXSON, LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: (215) 575-7000
jdesiderato@dilworthlaw.com
tford@dilworthlaw.com
strentalange@dilworthlaw.com

Gregory B. Heller (PA Bar No. 61130)
**MCLAUGHLIN & LAURICELLA, P.C.**
One Commerce Square
2005 Market Street, Suite 2300
Philadelphia, PA 19103
Tel: (267) 238-1211
gheller@best-lawyers.com

David Kairys (PA Bar No. 14535)
P.O. Box 4073
8225 Germantown Avenue
Philadelphia, PA  19118
dkairys@verizon.net

Stephen A. Sheller (PA Bar No. 3270)
**SHELLER, P.C.**
1528 Walnut Street, 4th Floor
Philadelphia, PA 19102
Tel: (215) 790-7300
sasheller@sheller.com

600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Tel: (202) 333-4562
jconnolly@baronbudd.com
sponson@baronbudd.com

Mark P. Pifko^
**BARON & BUDD, P.C.**
15910 Ventura Blvd #1600
Los Angeles, CA 91436
Tel: (818) 839-2333
mpifko@baronbudd.com

Andrew Sacks (PA Bar No. 41390)
John Weston (PA Bar No. 26314)
**SACKS WESTON, LLC**
1845 Walnut Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 925-8200
asacks@sackslaw.com
jweston@sackslaw.com

^ *Pro hac vice* to be filed

*Counsel for Plaintiff*
*City of Philadelphia*

## JURY DEMAND

City of Philadelphia hereby demands a trial by jury on all issues of fact and damages as stated herein.

DATED: October 7, 2022

Respectfully submitted,

_____

Diana Cortes, City Solicitor
(PA Bar No. 204274)
Renee Garcia, Head of Litigation
(PA Bar No. 315622)
Benjamin H. Field, Deputy City Solicitor
(PA Bar No. 204569)
**CITY OF PHILADELPHIA LAW DEPT.**
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
Tel: (215) 683-5000
diana.cortes@phila.gov
renee.garcia@phila.gov
benjamin.field@phila.gov

Russell W. Budd^
Christine C. Mansour^
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave, Suite 1100
Dallas, TX 75219
Tel.: (214) 521-3605
rbudd@baronbudd.com
cmansour@baronbudd.com

Burton LeBlanc^
**BARON & BUDD, P.C.**
2600 Citiplace Drive
Baton Rouge, LA 70808
Tel.: (225) 927-5441
bleblanc@baronbudd.com

Jennifer F. Connolly^
Stanford B. Ponson (PA Bar No. 322548)
**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Tel: (202) 333-4562
jconnolly@baronbudd.com
sponson@baronbudd.com

Jerry R. DeSiderato (PA Bar No. 201097)
Timothy J. Ford (PA Bar No. 325290)
Silvio Trentalange (PA Bar No. 320606)
**DILWORTH PAXSON, LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: (215) 575-7000
jdesiderato@dilworthlaw.com
tford@dilworthlaw.com
strentalange@dilworthlaw.com

Gregory B. Heller (PA Bar No. 61130)
**MCLAUGHLIN & LAURICELLA, P.C.**
One Commerce Square
2005 Market Street, Suite 2300
Philadelphia, PA 19103
Tel: (267) 238-1211
gheller@best-lawyers.com

David Kairys (PA Bar No. 14535)
P.O. Box 4073
8225 Germantown Avenue
Philadelphia, PA  19118
dkairys@verizon.net

Stephen A. Sheller (PA Bar No. 3270)
**SHELLER, P.C.**
1528 Walnut Street, 4th Floor
Philadelphia, PA 19102
Tel: (215) 790-7300
sasheller@sheller.com

Mark P. Pifko^
**BARON & BUDD, P.C.**
15910 Ventura Blvd #1600
Los Angeles, CA 91436
Tel: (818) 839-2333
mpifko@baronbudd.com

Andrew Sacks (PA Bar No. 41390)
John Weston (PA Bar No. 26314)
**SACKS WESTON, LLC**
1845 Walnut Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 925-8200
asacks@sackslaw.com
jweston@sackslaw.com


^ *Pro hac vice* to be filed

*Counsel for Plaintiff*
*City of Philadelphia*